936 A.2d 915

**Minh–Vu HOANG**

v.

**HEWITT AVENUE ASSOCIATES, LLC.**

**No. 1048 Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Dec. 7, 2007.

564

Rachel T. McGuckian, Rockville, for appellant.

Gerald F. Chapman, Bethesda, for appellee.

Panel: MURPHY, C.J., DEBORAH S. EYLER, LAWRENCE F. RODOWSKY (Ret'd, Specially Assigned), JJ.

EYLER, DEBORAH S., Judge.

The genesis of this appeal is a failed real estate transaction in the Silver Spring area of Montgomery County. Hewitt Avenue Associates, LLC ("HAA"), the appellee, entered into a contract to purchase two contiguous parcels of raw land from Minh–Vu Hoang, the appellant, and others. The multiple listing for the property advertised it as suitable for building 15 town houses. HAA purchased the property to develop into a town house community. When Hoang and the other sellers failed to close on the sale, HAA sued them, in the Circuit Court for Montgomery County, for specific performance and breach of contract. In the *ad damnum* clause of its breach of contract count HAA sought damages "in excess of $100,000."

Orders of default were entered against the served defendants when they did not file timely answers or responsive pleadings. The appellant moved, unsuccessfully, to vacate the default order against her. The court then held an evidentiary hearing on relief. The appellant attended, with counsel. (The other defendants did not appear.) At the hearing, HAA elected to pursue damages instead of specific performance. It proceeded to present evidence of the profits it would have realized from developing the town house community, but for the defendants' breach. The court ruled in HAA's favor and awarded it $1,889,755.98 in damages.

From the judgment entered against her in that amount, the appellant noted this appeal, presenting the following questions, which we have reordered and restated:

I. Did the trial court err in awarding damages in excess of $100,000?

II. Did the trial court err in awarding damages for collateral lost profits?

III. Did the trial court err in entering monetary judgments individually against the partners in a partnership of which the appellant is a member?

IV. Did the trial court err by not reducing the judgment to present value?

V. Did the trial court err by entering judgment against the appellant for attorney's fees and expert witness fees when she did not sign the contract of sale?

For the following reasons, we answer "Yes" to Question I and "No" to Questions II and III. On that basis, we shall modify the amount of the judgment against the appellant to conform to the sum stated in the *ad damnum* clause of HAA's complaint, which, for the reasons we shall explain, is $100,000, and shall vacate the judgment awarding damages in excess of that sum. Given our disposition of Question I, it is not necessary to address Question IV. Finally, Question V is not preserved for review.

## FACTS AND PROCEEDINGS

On May 7, 2004, "Thinh Q. Vu et al" and Fred A. Ezra entered into a "Regional Sales Contract" ("Sales Contract") by which Ezra or his assigns agreed to purchase two contiguous parcels of raw land for $760,000: 3401 Hewitt Avenue ("Parcel One") and 3405 Hewitt Avenue ("Parcel Two"). Settlement was to take place in 60 days, on July 6, 2004. Ezra later formed HAA and assigned his rights under the Sales Contract to it. (In this opinion, we shall refer to HAA, Ezra, and his business, The Ezra Company, interchangeably.)

The parcels were listed for sale by defendant Thanh Hoang, the appellant's husband, who is a real estate agent. As noted above, the multiple list offer stated that the land was suitable for building 15 town houses.

Ezra is the Chairman and CEO of The Ezra Company, a real estate construction and development business. After the Sales Contract was signed, Ezra obtained a title search that revealed that Parcel One is owned by Thinh Q. Vu, the appellant's brother, and Hong Ngoc Nguyen, Thinh Q. Vu's wife, as tenants by the entireties, and Parcel Two is owned by Alta Vista General Partnership ("AVGP"). The general partners in AVGP are the appellant, Thanh Hoang, Hao Vu, Van Vu, and Ruby J. Jacobs.

On June 28, 2004, Ezra's lawyer wrote to Craig Parker, counsel for the sellers, attaching a copy of the title commitment Ezra had received and advising of the results of the title search:

As you can see, all of the titled owners have not executed the sales contract. Also you will note from this title report, we must have a copy of the partnership papers for [AVGP].

I have prepared a Ratification of Regional Sales Contract to address the above and request that your clients promptly execute and return the document to me with the requisite exhibit.

The title commitment also reports that the unpaid taxes for [Parcel Two] has resulted in a tax sale and the subsequent filing of a Foreclosure of the Rights of Redemption which must be dismissed in order to convey title.

The title issues were not resolved before the July 6 settlement date. That day, Ezra's lawyer informed Parker, in writing, that HAA had tendered to a title company the funds necessary for settlement and was prepared to go forward with closing. The letter warned, "Please be advised that if your clients fail to settle today pursuant to the contract, they shall be in default of the agreement and we shall pursue all remedies available to us." Nevertheless, settlement did not happen on July 6.

Between July 6 and July 15, HAA's lawyer wrote several letters to Parker, including one demanding that settlement go forward at 1:00 p.m. on July 16. When the sellers did not appear for settlement that day, HAA filed suit.

The complaint named eight defendants: the appellant, Thanh Hoang, Thinh Q. Vu, Hong Ngoc Nguyen, AVGP, Hao Vu, Van Vu, and Ruby J. Jacobs. The appellant was sued individually and as a partner in AVGP. Hong Ngoc Nguyen, who lives in China, was not served. Affidavits of service were filed for the other seven defendants, including the appellant.

As explained, orders of default were entered against the seven served defendants, and the appellant moved to vacate the order against her. She argued that she had not been

served; that "the Defendants" "acknowledged that they agreed to sell [Parcel One and Parcel Two]"; that she had received a $ 10,000 deposit from Ezra; that the defendants were ready to convey the parcels to HAA; that the defendants had never been asked to attend a settlement; and that she had delivered a deed to HAA that same day.[1]

HAA opposed the motion to vacate, asserting that the appellant properly had been served and knew about the lawsuit; that she had not explained her failure to plead; and that the deeds she had delivered with her motion to vacate were defective and could not effect conveyances of the parcels. In a supplemental opposition, HAA recounted the appellant's extensive history as a civil litigant in real property cases in Montgomery County.[2]

The court held a hearing on the appellant's motion to vacate and denied it. One month later, the court held an evidentiary hearing on relief. The appellant appeared with Parker as her counsel. During the hearing, HAA's lawyer informed the court that his client had elected not to pursue specific performance, and instead to pursue damages. It is undisputed that the election first was made and communicated to the appellant at that time.

HAA called three witnesses: Mark Ezra, a managing member of HAA and senior vice president of The Ezra Companies (and Fred A. Ezra's son); Paul Goodsite, an expert in the residential building business; and James Donnelly, an expert appraiser in the residential development and construction field. The appellant did not call any witnesses but testified on her own behalf.

Mark Ezra explained that The Ezra Company, which is located in Bethesda, is "a 50–person Maryland based real estate company that does development, construction, and sales

---

1. The appellant filed the motion to vacate *pro se*. Although she purported to speak for all of the defendants, only she signed the motion.

2. HAA listed 123 circuit court cases in which the appellant and/or her husband were parties, from 1997 to 2004.

of real estate." The company has been in operation for about 25 years; for 15 years, he has been its senior vice president. The company decided to buy the parcels in question because they were listed as being suitable for building a town house development. It was the company's typical practice to form a separate legal entity for each construction project; hence the formation of HAA. Thanh Hoang, the realtor, knew that Ezra/HAA was purchasing the parcels in order to build town houses, just as the parcels had been marketed for sale. HAA had drawn up plans to construct 14 town houses on the parcels. (The zoning for the land allowed town houses to be built.)

The town house project the company had in mind was a "very straightforward project for [them]." In the five years preceding the Sales Contract, the company had developed about 4 million square feet of real estate. Its planned project for the two parcels was to be about 30,000 square feet. The company had adequate resources to develop the property, build the town houses, and resell them. It had worked with experts to calculate the income the project would generate and the cost of the project. The project was slated to commence in July or August of 2004, and to take three years to complete.

The 14 town houses would be expected to sell for $440,000 each, which is a conservative number in Montgomery County. Given the projected revenue from sales of the town houses and the projected expenses for building the town house community, Mark Ezra anticipated that the project would generate a profit of "just under $1.9 million," by a conservative estimate. He acknowledged that he decided to seek money damages in this case instead of specific performance because there were "issues" with the title to the parcels.

Mark Ezra also testified that HAA had incurred $16,760.98 in legal fees in this case and $2,000 apiece for expert witness fees for the two experts.

Paul Goodsite works with Chase Homes, Inc., in residential real estate development. He testified as an expert in that field. HAA had furnished him with the projected revenues

and expenses for the town house project: $6,160,000 in revenues and $4,291,000 in expenses, which would produce a profit of slightly over $1,868,000. Goodsite opined that the revenue and expense figures were reasonable, if not conservative, and likely to be achieved; and that the projected profit was "very reasonable" and also "likely to be achieved."

James Donnelly is a real estate appraiser for residential properties and projects such as the town house development HAA planned to undertake in this case. He too opined that the projected revenue and expense figures for the project were reasonable and "likely to be achieved." In his view, the projected profit for the project was conservative. He prepared an appraisal report, which was admitted into evidence, that disclosed that the fair market value of like-kind town houses in the same area ranged from $417,000 to $456,000.

The appellant testified that Parcel One is owned by her brother and sister-in-law (Thinh Q. Vu and Hong Ngoc Nguyen), who live in China. She and her husband once owned Parcel Two, but it was sold at foreclosure to AVGP. The appellant represented that she was "prepared to sell the property" and that she had obtained the necessary documents for settlement "on the property." As she put it, she had "prepare[d] the deed and deliver the original to the Court to be held in escrow by the Court, so it, I deliver the deed to the Court, and then I send a copy to the settlement attorney, about three, four, months ago, I think." That was the sum and substance of her testimony.

In closing argument, counsel for HAA asked for an award of more than $1.8 million dollars for the lost profits the town house project would have generated, but for the defendants' breach. The appellant's lawyer argued that the court should order specific performance and that, in any event, the lost profits sought were not recoverable because they were speculative and not reasonably certain. He further argued that lost profits of the sort sought by HAA are not the proper measure of damages for breach of an executory contract to sell land. Rather, the proper measure of damages was the fair market

value of the land at the time of the breach less the unpaid sales price (minus any deposit) under the Sales Contract. HAA had not introduced any evidence of the value of the parcels on July 6, 2004, however.

Ruling from the bench, the trial judge explained that a contract purchaser under an executory contract to convey land can recover lost profits upon proving: 1) that the defendant/seller breached the contract; 2) that, when the contract was entered into, the defendant/seller reasonably could have foreseen that a loss of profits would be a probable result of the breach; and 3) that the amount of lost profits claimed was proven with reasonable certainty.

The trial judge then evaluated the proof against that standard. He found that the default orders established liability for breach of contract. He further found that because the appellant "has extensive experience in the real estate market," the parcels were marketed for purposes of development into 15 town houses, and the contract purchaser was a developer, "it was clear to all parties at the time the contract was entered into that the force driving this agreement between them was anticipated profits by the purchaser in purchasing the property offered by the seller, so clearly a loss of profits was foreseen, if in fact there was a breach."

The trial judge went on to find that HAA's projected revenue and expense figures for the town house project were straightforward and, as the two expert witnesses had testified, the figures were reasonable and indeed conservative. The court factored in that the real estate market was "well-established" and that the evidence presented by HAA assumed a flat market, not one that would increase. The court found that the real estate market "will almost certainly continue to appreciate at some rate." It noted, in addition, that town houses, being on the lower end of the housing market, enjoy greater protection from downward fluctuations in the real estate market than do other, more expensive, houses. The court placed weight on the evidence that The Ezra

Company is an established real estate development firm that has been doing business for many years.

The trial judge observed that "courts and juries" make projections of future losses over relatively short periods of time, here 3 years, "day in and day out":

There's no question that a party is entitled to recover, for instance, in a negligence case, the cost of future surgeries if the doctors opine that such surgeries may be necessary. In determining the costs of those surgeries, the doctors try and figure in, and the experts figure in, what is the projected cost of the surgery to be at that future point in time. Business, banks, everybody in this day and age, has to make assumptions upon which billions of dollars are loaned, as to what is the real estate market likely to do a year from now, two years from now, even further out. So certainly it appears to the Court that beyond any question, we are at a point in time, if we weren't previously, where reasonable assumptions can be made as to whether or not and to the amount of profits that might be lost from a developer's inability to sell its product, that is, completed homes, certainly two years down the road.

On that basis, and because HAA had presented conservative figures, the court found that "the amount of profits in this case can be determined with reasonable certainty."

Finally, the court rejected the appellant's argument that it should order specific performance, ruling that it was HAA's choice as to which remedy to pursue. The court found that the amount of attorneys' fees and expert witness fees incurred by HAA was fair and reasonable, and entered judgment against all of the defaulting defendants for the lost profits, attorneys' fees, and expert expenses: $1,889,755.98.[3]

---

3. More than 10 days but less than 30 days after entry of the judgment, four of the defendants, not including the appellant, moved to vacate the default judgments against them. Those four are Thinh Q. Vu, Hao Vu, Van Vu, and Ruby J. Jacobs. The latter three, like the appellant and Thanh Hoang, her husband, had been sued individually and as partners in AVGP.

## STANDARD OF REVIEW

When a case has been tried to the court, our standard of review is governed by Rule 8–131(c), which provides:

During the pendency of the appeal, the circuit court granted the four defendants' motions to vacate. Thereafter, HAA voluntarily dismissed its claims against those defendants, with prejudice. Judgments remained in place against Thanh Hoang and AVGP, neither of which noted an appeal.

On May 10, 2005, thirteen days after entry of the judgment against her, the appellant filed a voluntary Chapter 11 bankruptcy petition in the Bankruptcy Court for the District of Maryland. Subsequently, on June 24, 2005, she filed a "Suggestion of Bankruptcy" in this case noting that, pursuant to 11 U.S.C. § 362(a), the bankruptcy filing operated as an automatic stay on proceedings against her in the instant case.

On July 7, 2005, the appellant filed her notice of appeal to this Court. The time for appeal would, ordinarily, have expired thirty days after the entry of the judgment (May 27, 2005). However, pursuant to 11 U.S.C. § 108(b):

[I]f applicable nonbankruptcy law ... fixes a period within which the debtor ... may file any pleading, demand, *notice*, ... or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of-

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) 60 days after the order for relief.

(Emphasis added.)

While the statute only explicitly refers to the powers of the "trustee," this provision has been interpreted to apply equally to the debtor. *See Local Union No. 38, Sheet Metal Workers' Int'l Ass'n., AFL–CIO v. Custom Air Sys., Inc.*, 333 F.3d 345, 347–48 (2d Cir.2003) (*"Custom Air Systems"*); *Autoskill, Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1484 n. 4 (10th Cir.1993). Furthermore, section 108 has been interpreted to apply to the filing of a notice of appeal. *Custom Air Systems, supra*, 333 F.3d at 347.

An "order for relief" in a voluntary bankruptcy proceeding, such as the one filed by the appellant, is the actual filing of the bankruptcy petition, which the appellant accomplished on May 10, 2005. *See* 11 U.S.C. § 301(b) ("[t]he commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter"); 9A Am. Jur.2d *Bankruptcy* § 1062 ("[t]he commencement of a voluntary bankruptcy case by filing a petition in the bankruptcy court constitutes the entry of an order for relief in the voluntary case."). Thus, under 11 U.S.C. § 108(b), the latest that the appellant could have filed her notice of appeal was July 9, 2005, 60 days after she filed the bankruptcy

[T]he appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

Thus, we give deference to the factual findings of the trial judge and will reverse only for clear factual error. *Mercy Med. Ctr., Inc. v. United Healthcare of the Mid–Atlantic, Inc.,* 149 Md.App. 336, 354–55, 815 A.2d 886 (2003); *Knapp v. Smethurst,* 139 Md.App. 676, 695, 779 A.2d 970 (2001). A factual finding is clearly erroneous if there is no competent and material evidence in the record to support it. *YIVO Inst. for Jewish Research v. Zaleski,* 386 Md. 654, 663, 874 A.2d 411 (2005). The legal conclusions reached by the circuit court are not accorded deference on appeal, however, and instead are reviewed *de novo. L.W. Wolfe Enters., Inc. v. Maryland Nat'l Golf, L.P.,* 165 Md.App. 339, 344, 885 A.2d 826 (2005).

## DISCUSSION

### I.

### Award of Damages in Excess of *Ad Damnum* Request

In its complaint, HAA identified the parties, explaining their relationships to the transaction; stated the basis for jurisdiction and venue; alleged "Facts Common To All Counts"; and stated claims for "Specific Performance" and "Breach of Contract," in Counts I and II, respectively. In essence, HAA's common facts alleged that "[t]he Defendants have failed and refused to settle in accordance with Sales Contract and have not replied to the Second Demand Letter."

In Count I, HAA averred that it was "ready, will [sic] and able to perform under the Sales Contract, ... has tendered sufficient funds to the settlement agent for settlement, ... has made demand to Defendants for settlement, and Defendants

petition on May 10, 2005. Because the appellant filed her notice of appeal on July 7, 2005, her appeal was timely.

have failed to settle and perform under the Sales Contract." In its prayer for relief, it asked the court to order the defendants to perform "each and every one of the terms of the Sales Contract" and to award it costs, expenses, reasonable attorneys' fees, and "such other and further relief as the cause of justice may require."

In Count II, HAA alleged that the "Defendants have breached the [Sales Contract]....by virtue of Defendants' failure to settle under the terms of the Sales Contract" and that "Plaintiff has been damaged by the foregoing breach of contract b y the Defendants." Its prayer for relief then stated:

WHEREFORE, Plaintiff prays for a judgment in damages against the Defendants, jointly and severally, for breach of contract in an amount to be determined at trial which Plaintiff estimates to be in excess of $100,000, for Plaintiff's costs herein, for Plaintiff's reasonable attorney's fees and expenses, and for such other and further relief as the cause of justice may require.

In his closing argument, HAA's lawyer asked the court to award $1,889,755.98. When closing arguments were over, the trial judge asked HAA's lawyer, "Have you sought damages, though, only in an amount of $100,000 in your complaint?" HAA's lawyer responded:

Pardon me? The amount, the complaint said that damages were believed to be in excess of $100,000. It was not specified in the complaint other than that.

The judge responded, "Okay."

### (a)

The appellant contends the trial court erred by awarding HAA more than $100,000 in damages. She argues that HAA's prayer for damages "in excess of $100,000" in Count II of the complaint was, in effect, a prayer for $100,000 in damages; that Maryland case law treats the *ad damnum* clause of a complaint as a limitation on the amount of damages a plaintiff may recover; and therefore HAA was limited to recovering

$100,000 in damages for breach of contract. She also argues that lost profits are special damages that must be pleaded specially, under Maryland common law. The complaint did not allege that HAA had sustained lost profits and did not pray for recovery of damages for lost profits; indeed, it did not mention lost profits. The appellant maintains that the judgment must be reversed or, at the very least, reduced to $100,000.

HAA initially responds that this issue is not preserved for appellate review because it was not raised by the appellant below.

On the merits, HAA argues that its prayer for damages "in excess of $100,000" and for "such other relief as the cause of justice may require" put the appellant on notice that it was seeking more than $100,000, "since at the time of the filing of the complaint, a complete damages calculation had not been made." Therefore, it was entitled to recover damages in an amount over $100,000. It further argues that the allegations in the complaint and the general request for damages were sufficient to meet the requirements of notice pleading, and that there was no need to plead damages specially. It asserts that,

> [b]ased on [the prayer for damages in excess of $100,000 and such other relief as justice may require], the fact that the properties were marketed in the MLS system as suitable for the construction of 15 townhomes, and the fact that the purchaser was a real estate developer with extensive experience in developing, constructing and selling properties, the natural, necessary and logical consequences of the breach of the contract by the defendants, including Appellant, were that Appellee would suffer a loss of profits.

### (b)

For almost 200 years, Maryland has followed the common law rule that the amount of compensatory damages a plaintiff may recover in a civil action is limited to the amount of damages requested in his operative pleading. In *Harris v.*

*Jaffray*, 3 H. & J. 543 (1811), a jury awarded the plaintiff a sum in excess of what he had sought in the *ad damnum* clause of his complaint. After the defendant noted an appeal, the plaintiff asked the Court of Appeals to order the defendant to show cause why he (the plaintiff) should not be permitted to release that part of the damages award in excess of the *ad damnum* amount, so the Court could "amend the record by entering judgment" for the amount sought in the complaint. The Court declined, holding that, without statutory authority to accept such an amendment to the judgment, it only could reverse the judgment for error. *Id.* at 548.

In holding that the plaintiff could not recover damages in excess of the amount claimed, the *Harris* Court relied on English common law cases that are the progeny of *Persival v. Spencer*, Yelv. 46, 80 Eng. Rep. 33 (K.B.1605), a seminal case. In *Persival*, the King's Bench reversed a judgment for the plaintiff for a sum in excess of the amount demanded in his prayer for relief. The court reasoned that the plaintiff "is in law taken to have the best knowledge of his own damage[.]" *Id.* at 33. Unlike the Court of Appeals in *Harris*, however, the King's Bench held that it had the power to affirm such a judgment if, after the verdict, the plaintiff released the excess damages and took only the amount prayed for. *See also Vale v. Egles*, Yelv. 70, 80 Eng. Rep. 49 (K.B.1606) (stating the same rule but holding that costs are not part of damages for purposes of limiting recovery to the amount prayed).

In prompt response to the Court of Appeals' decision in *Harris*, the General Assembly enacted a law providing that, when a judgment is entered for a sum greater than the amount of damages demanded in the operative pleading, the judgment shall not be reversed, but the plaintiff may, on appeal, be permitted to put in the record a release of the excess damages amount; and in that situation the appellate court is to proceed on the amended record, as if the release had been given by the plaintiff in the trial court. Chapt. 161, Acts of 1811, enacted January 4, 1812. This statute is the original predecessor to present Rule 8–604(c)(2), which we shall discuss *infra*. *See also Finch v. Mishler*, 100 Md. 458,

462, 59 A. 1009 (1905) (on appeal, plaintiff who had been awarded a judgment of $32 more than the *ad damnum* clause amount released that sum in the Court of Appeals, pursuant to statute); *cf. Attrill v. Patterson,* 58 Md. 226, 260–61 (1882) (observing, in reversing judgment on unrelated grounds, that a remittitur granted by the trial court in an amount equal to the excess of the damages awarded over the damages sought was "in entire conformity with the law, practice and decisions of the State.")

Thereafter, at least until the 1990's, the Maryland appellate opinions commenting upon the common law rule that a plaintiff may not recover damages in excess of the amount demanded in his complaint have stated only that the rule is firmly established. *See Scher v. Altomare,* 278 Md. 440, 442, 365 A.2d 41 (1976) (stating, in *dicta,* "[o]f course, the recovery, if any, by the plaintiff cannot exceed in nature or amount either the damage proved or the sum claimed in the *ad damnum,* whichever is the lesser"); *Dick v. Biddle Bros.,* 105 Md. 308, 316, 66 A. 21 (1907) (holding that in action for balance due on contract, jury verdict in excess of amount sought by plaintiff in bill of particulars required reversal of judgment); *Baltimore City Lodge No. 3 of the Fraternal Order of Police, Inc. v. Mantegna,* 61 Md.App. 694, 697, 487 A.2d 1252 (1985) *("Baltimore City Lodge No. 3")* (commenting in *dicta* that "a plaintiff may not recover damages in an amount greater than that claimed"); *Carl M. Freeman Assocs., Inc. v. Murray,* 18 Md.App. 419, 420 n. 3, 306 A.2d 548 (1973) (commenting in *dicta* that "[i]t has long been the law of this State that if a plaintiff recovers a verdict in excess of the damages laid in the declaration a remittitur by the trial court is proper"). *See also Travel Comm., Inc. v. Pan Am.,* 91 Md.App. 123, 154–55, 603 A.2d 1301 (1992) (recognizing the rule but holding that it did not apply because the total amount of damages awarded did not exceed the amount of damages prayed in several counts of the operative pleading, added together).

Also until recently, it was established Maryland statutory law that, after a jury trial, a circuit court did not have authority to grant leave to amend the operative pleading. Md.

Rule 320(c)(2) (repealed 1984); *Robertson v. Davis,* 271 Md. 708, 319 A.2d 816 (1974) (holding that trial judge could permit amendment of damages claim up to date of trial). Thus, if a jury awarded damages in excess of the amount requested in the *ad damnum* clause of the complaint, the complaint could not then be amended so as to conform the *ad damnum* request to the damages actually awarded. This established law changed, or at least became murky, in 1984, with the revision of the Maryland Rules of Civil Procedure.

Before revision, Rule 320, governing amendments of pleadings, did not permit any amendment after "the jury retires to make up its verdict." Rule 320(c)(2) (repealed 1984). After the revision, however, new Rule 2–341, "Amendment of pleadings," provided, at subsection (b):

> **Within 15 days of trial date and thereafter.** Within 15 days of a scheduled trial date *or after trial has commenced, a party may file an amendment to a pleading only by written consent of the adverse party or by leave of court.* If the amendment introduces new facts or varies the case in a material respect, the new facts or allegations shall be treated as having been denied by the adverse party. The court shall not grant a continuance or mistrial unless the ends of justice so require.

(Emphasis added.) This new language suggested that a plaintiff, upon obtaining a jury verdict for damages in excess of the amount demanded in his complaint, could seek leave to amend the *ad damnum* clause to conform to the amount actually awarded; and that the trial court had the authority to grant leave to so amend.

Such was the state of Maryland law of pleading and damages when the Court of Appeals decided *Falcinelli v. Cardascia,* 339 Md. 414, 663 A.2d 1256 (1995), and *Scott v. Jenkins,* 345 Md. 21, 690 A.2d 1000 (1997). Those cases prompted amendments to the Maryland Rules that are important to the issue before us.

In *Falcinelli,* due to the unusual procedural posture of the case on appeal, the Court was called upon to examine, indi-

rectly, what authority (if any) a circuit court has to allow a plaintiff to amend his complaint, post jury verdict, to conform the amount of damages sought in the *ad damnum* clause to the amount awarded by the jury.

In that automobile tort action, the jury awarded the plaintiff $205,187.08 in damages, more than twice the amount requested in the *ad damnum* clause of the complaint. Within 10 days after entry of the judgment, the defendant moved for a new trial or remittitur on the ground that the damages awarded exceeded the amount prayed for in the complaint. The plaintiff countered by moving for leave to amend her complaint to raise the *ad damnum* amount to conform to the verdict. In response, the defendant argued that Rule 2–341 did not authorize the amendment of a pleading after trial.

The trial court granted the plaintiff's motion, allowing her to amend the *ad damnum* clause of her complaint, which she did. Instead of noting an appeal within 30 days of the entry of judgment, or the entry of that order, however, the defendant filed a second post-judgment motion, for reconsideration, within ten days of the entry of the court's order permitting the amendment. The court denied that motion. The defendant noted an appeal within 30 days after entry of the order denying the motion for reconsideration.

The Court of Appeals was faced with the threshold question whether it had jurisdiction to review the order granting leave to amend. The defendant argued that the original judgment was not appealable, because the trial court had been without jurisdiction to enter a judgment for damages above the *ad damnum* amount. The Court held that, notwithstanding that Maryland common law long has held that a plaintiff's damages recovery is limited by the amount sought in his complaint, the *ad damnum* clause of a complaint "does not inherently limit the power of the jury to render a verdict an d does no t inherently limit the power of the court to enter a judgment." *Falcinelli, supra,* 339 Md. at 427, 663 A.2d 1256. Therefore, the Court concluded, the trial court had had jurisdiction to

enter judgment for $205,187.08, and that judgment was final and appealable when entered.

Because the defendant did not note an appeal within 30 days of entry of that judgment, he could not challenge the legality of the court's decision to grant leave to amend the complaint. Rather, he only could challenge the denial of his motion for reconsideration. That decision was subject to narrow review for abuse of discretion only. For that reason, the Court did not answer the legal question whether an *ad damnum* clause of a complaint may be amended after a jury verdict has been returned.

The same day its *Falcinelli* opinion was filed, the Court of Appeals sent a letter to the Rules Committee, asking it to "look at this problem and recommend clarification of the amendment rule [2–341], one way or the other." Letter from the Hon. Lawrence F. Rodowsky, Judge, Maryland Court of Appeals, to the Hon. Alan M. Wilner, Chairman, Court of Appeals Standing Comm. on Rules and Practice (Aug. 24, 1995) (in minutes of Court of Appeals Standing Comm. on Rules of Practice and Procedure, Sept. 6, 1996, Appendix 3).

On March 14, 1997, while the Rules Committee was studying the issue, the Court of Appeals filed its opinion in *Scott v. Jenkins, supra,* 345 Md. 21, 690 A.2d 1000. In that case, the Court held that, for a plaintiff to recover punitive damages in a tort action, his complaint must include a specific claim for punitive damages and must specifically allege the facts that would entitle him to recover punitive damages. The Court emphasized the importance of pleading, explaining that it serves four distinct roles: "(1) provid[ing] notice to the parties as to the nature of the claim or defense; (2) stat[ing] the facts upon which the claim or defense allegedly exists; (3) defin[ing] the boundaries or [the] litigation; and (4) provid[ing] for the speedy resolution of frivolous claims and defenses." *Id.* at 27–28, 690 A.2d 1000. The Court observed that "[o]f these four, notice is paramount." *Id.* at 28, 690 A.2d 1000.

In analyzing the questions presented, the *Scott* Court discussed the requirements of Rule 2–305 (1997) (amended 2003),

entitled "Claims for relief." As then worded, the rule directed that,

> a pleading that sets forth a claim for relief . . . shall contain a clear statement of the facts necessary to constitute a cause of action *and a demand for judgment for relief sought.* Relief in the alternative or of several different types may be demanded.

(Emphasis supplied.) The Court concluded that because punitive damages "serve different ends than do general damage awards, and are therefore properly classified as different in nature, a specific claim for their recovery must be made." *Scott, supra,* 345 Md. at 37, 690 A.2d 1000. In support, it cited its observation in *Falcinelli, supra,* 339 Md. at 423, 663 A.2d 1256, based upon the language of *Scher v. Altomare, supra,* 278 Md. at 442, 365 A.2d 41, that a plaintiff may recover the lesser of the damages proved or the damages demanded in the *ad damnum* clause of the operative complaint.

The Rules Committee studied and debated several possible amendments to Rule 2–305: one that would eliminate *ad damnum* clauses altogether, requiring only a statement that the jurisdictional amount was met and a demand for a money judgment; one stating expressly that a specific amount sought must be included in the *ad damnum* clause; one prohibiting amendment of the *ad damnum* clause after trial; and one allowing amendment of the *ad damnum* clause after trial. Ultimately, it recommended amending Rule 2–305 by adding: "Unless otherwise required by law, a demand for a money judgment shall include the amount sought."

The Rules Committee also recommended that subsection (b) of Rule 2–341, "Amendment of pleadings," be changed to *prohibit* a circuit court from granting leave to amend the *ad damnum* clause in the operative pleading after a jury has returned a verdict. The proposed change would have added, at the end of the first sentence, the phrase, "except that the court may not grant leave to amend the amount sought in a

demand for a money judgment after a jury verdict is returned."

These recommendations were transmitted to the Court of Appeals by letter of October 2, 1997.

The Court of Appeals adopted the first recommendation by order of February 10, 1998, effective July 1, 1998. Accordingly, at the time of the events in the case at bar, Rule 2–305 directed that

[a] pleading that sets forth a claim for relief ... shall contain a clear statement of the facts necessary to constitute a cause of action and a demand for judgment for relief sought. *Unless otherwise required by law, a demand for a money judgment shall include the amount sought.* Relief in the alternative or of several different types may be demanded.

(Emphasis supplied.)

The Court rejected, however, the recommended amendment to Rule 2–341(b), to prohibit leave to amend the *ad damnum* clause post jury verdict. Instead, it adopted a "Committee note" to the contrary. The note reads: "By leave of court, the court may grant leave to amend the amount sought in a demand for a money judgment after a jury verdict is returned." The note clarifies that a circuit court has discretion to grant leave to amend the *ad damnum* clause in the operative complaint after a jury verdict has been returned. *Cf. James v. Butler,* 378 Md. 683, 700–02, 838 A.2d 1180 (2003) (recognizing authority of circuit court to grant leave to amend *ad damnum* clause of complaint to conform to amount awarded by jury, but holding that the court did not have discretion to do so in that case, because the plaintiff had used the evidentiary short cut in Md.Code (1974, 2002 Repl.Vol.), section 10–104 of the Courts and Judicial Proceedings Article ("CJ"), which applies only when the damages sought are in the jurisdictional amount allowed in District Court).

The Rules Committee also had discussed, but decided against, recommending the deletion of Rule 8–604(c), which, as stated previously, is the successor rule to the statute enacted

in response to the *Harris* decision in 1812. That rule of appellate procedure allows, in pertinent part, for the following disposition on appeal:

(c) **Correctible error.** (1) Matters of form. A judgment will not be reversed on grounds of form if the Court concludes that there is sufficient substance to enable the Court to proceed. For that purpose, the appellate court shall permit any entry to be made by either party during the pendency of the appeal that might have been made by that party in the lower court after verdict by the jury or decision by the court.

(2) *Excessive amount of judgment. A judgment will not be reversed because it is for a larger amount than claimed in the complaint if the plaintiff files in the appellate court a release of the excess.*

(3) Modified judgment. For the purposes of implementing subsections (1) and (2), the Court may modify the judgment.

(Emphasis added.) The Rules Committee Reporter's Note explained the committee's decision against recommending deletion of Rule 8–604(c):

The Committee recommends retention of [subsection (c)(2)] because the subsection, together with subsection (c)(3) of Rule 8–604, gives the appellate court discretion to enter the appropriate judgment in the situation where no motion was made at the trial court level and the error of a judgment in excess of the *ad damnum* is alleged on appeal.

*Md. Reg.*, Vol. 24, Issue 22, at 1539, Friday, Oct. 24, 1997.

### (c)

Against that legal backdrop, we first must decide whether an *ad damnum* clause seeking damages for breach of contract, "which Plaintiff estimates to be in excess of $100,000," permits an award of any amount of damages above $100,000, absent an amendment to the complaint. Preliminary to that decision, we must address HAA's assertion that that issue is not preserved for our review.

■ HAA argues that the issue is not preserved because it was not raised by the appellant below. Under Rule 8–131(a), ordinarily, this Court will not review on appeal any non-jurisdictional issue that was not raised or decided below. Here, the court *sua sponte* raised the issue whether it properly could award damages above $100,000, so the issue indeed was raised. HAA's lawyer asserted that, because the *ad damnum* request was for an amount "in excess of $100,000," there was no limitation on awarding any amount over $100,000, including the more than $1.8 million dollars he had requested in closing. Apparently, the court accepted this argument, as it responded, "Okay," and proceeded to award the amount requested by HAA's lawyer. Thus, the issue also was decided below. Accordingly, the preservation requirement of Rule 8–131(a) was satisfied.

The 1998 amendment to Rule 2–305 makes plain that a complaint for damages must set forth the amount of money being sought, unless to do so is not permitted by law. *See, e.g.,* CJ § 3–2A–02(b) (directing that a claim filed under the Health Care Malpractice Claims Act and any "initial pleading filed in any subsequent action may not contain a statement of the amount of damages sought other than that they are more than a required jurisdictional amount."). It was implicit in the Maryland common law rule limiting recovery of damages to the amount sought in the operative pleading that the *ad damnum* clause of that pleading set forth the amount of damages being sought; otherwise, it would be impossible to determine whether the amount awarded exceeded the amount requested. The 1998 amendment to Rule 2–305 thus added language stating expressly what already was required implicitly.

As explained above, by adopting that amendment, the Court of Appeals rejected competing amendments that would have eliminated *ad damnum* clauses entirely or required only a statement that the amount being claimed meets the jurisdictional amount or an even more general statement that money damages are being sought, without an amount specified. Instead, and consistent with its observation in *Scott v. Jenkins,*

*supra,* 345 Md. at 28, 690 A.2d 1000, that notice is the primary purpose of pleading, the Court required that a party seeking money damages tell the opposing party, from whom the damages are sought, the amount of damages he is seeking.

■ Whether HAA's *ad damnum* prayer for damages "in excess of $100,000" would permit a trier of fact to award an amount of damages above $100,000 is a matter of interpretation of the language of Rule 2–305, and therefore is a question of law. *Davis v. Slater,* 383 Md. 599, 604, 861 A.2d 78 (2004) ("Because our interpretation[s] of . . . the Maryland Rules are appropriately classified as questions of law, we review the issues *de novo* to determine if the trial court was legally correct. . . ."). The same fundamental principles of statutory construction apply to the interpretation of a rule. *Zetty v. Piatt,* 365 Md. 141, 152, 776 A.2d 631 (2001). As the Court of Appeals has noted, "First, we must examine the 'words of the rule, giving them ordinary and natural meaning.' Where the language of the rule is clear and unambiguous, our analysis ends." *Id.* (quoting *State v. Harrell,* 348 Md. 69, 79–80, 702 A.2d 723 (1997)). However, the goal of such analysis is always "to discern the legislative purpose. . . . To that end we must consider the context in which . . . the rule appears including related statutes or rules and relevant legislative history." *Davis, supra,* 383 Md. at 605, 861 A.2d 78.

■ Applying these general principles, we conclude that an *ad damnum* clause that seeks damages "in excess of" a stated amount cannot satisfy the plain language directive of Rule 2–305, that "a demand for a money judgment shall include the amount sought." A demand for a money judgment "in excess of" a given number is not a demand for "the amount sought" in damages. It is a request for damages in an unstated amount that is not less than the stated amount, *i.e.,* for a money judgment, of whatever unlimited sum, *higher* than the amount specified. A demand for "the amount sought" puts the opposing party on notice of the sum of money being sought in damages. A demand for damages "in excess of" a stated amount does not; it only informs the defendant that the

plaintiff will not be satisfied with an award lower than the amount stated, without giving notice of the maximum sum the plaintiff is seeking. Indeed, a demand for damages "in excess of" a stated amount is similar to a statement that the sum requested satisfies the jurisdictional amount of the court, in that it informs of a floor, but not a ceiling.

The trial court in the case at bar ruled that, on the state of the complaint at trial, the law would permit HAA to recover damages for breach of contract above the $100,000 stated in the *ad damnum* clause. That ruling was legally incorrect. Either HAA's complaint did not plead *any* amount of damages, in which case the entire claim was defective, *see Baltimore City Lodge No. 3, supra*, 61 Md.App. 694, 697, 487 A.2d 1252 (citing *Treusch v. Kamke*, 63 Md. 274, 276–77 (1885)), or its request for an award "in excess of $100,000" must be read as a request for $100,000. Given that the *ad damnum* clause properly stated a specific sum, but then improperly modified it, by the phrase "in excess of," to make it non-specific, we conclude that the offending words should be read out of the *ad damnum* clause, and therefore the clause must be read as one seeking $100,000 in damages.

■ Having concluded that the trial court erred in ruling that HAA could recover more than $100,000 on the state of its complaint, we next must determine whether that error was prejudicial. *See Flores v. Bell*, 398 Md. 27, 33, 919 A.2d 716 (2007) (holding that, in a civil action, a judgment only will be reversed if the lower court committed an error and the error prejudiced the party challenging the judgment). If the error was prejudicial to the appellant, we then must determine the proper disposition of this appeal, given the error.

As discussed above, the Committee note approved by the Court of Appeals for Rule 2–341(b) telegraphs that a circuit court has the power to grant leave to amend the operative pleading, including the *ad damnum* clause, after a jury has returned its verdict in the case; and that the decision whether to do so is discretionary. *See also James v. Butler, supra*, 378 Md. at 700–01, 838 A.2d 1180. In the case at bar, which was tried on damages to the court, HAA did not move to amend its

complaint before trial, during trial, or post-trial, to conform the *ad damnum* clause for Count II to the amount of damages it was seeking and ultimately was awarded. Indeed, HAA's stated position, that the words "in excess of" $100,000 in the *ad damnum* clause permitted the court to award any amount above that sum as damages, obviated the issue of amendment. There would be no need to seek leave to amend an *ad damnum* clause to permit recovery of a greater sum than that stated in the clause if the words "in excess of" accomplished that very purpose. Moreover, the trial court's legal error in ruling that the "in excess of" language of the complaint allowed an award above $100,000 further obviated the issue of amendment.

If, however, the trial court could have and necessarily would have been required to grant leave to HAA to amend the *ad damnum* clause of its complaint to conform to the $1.8 million dollars in damages it was seeking to recover, the court's error would be harmless, as the outcome of the proceedings would not have been affected. *Cf. Cole v. Gales,* 47 Md.App. 506, 509, 423 A.2d 972 (1981) (holding that default judgment establishes liability only and that, when, in the course of a contested trial on damages, plaintiff learns of an item of damage he did not know about previously, court had discretion to allow him to amend the *ad damnum* clause of his complaint to include the newly discovered amount). There was no such requirement, as decisions about amendments are discretionary; moreover, in the circumstances of this case, it would have been an abuse of the court's discretion to grant HAA leave, during the damages inquisition, to amend the *ad damnum* clause of its complaint to increase the amount sought from $100,000 to $1,889,755.98.

Liability in the case at bar was established by default. The conduct alleged in the complaint, *i.e.,* that the appellant failed to convey the parcels of land as required by the Sales Contract, was taken as proven. The complaint did not allege that HAA had sustained lost profits as a result of the failure to convey. We agree with HAA that it was not required to specially plead lost profits, for the reasons we shall explain in

our discussion of Issue II. Nevertheless, the absence of any allegation of lost profits in the complaint is a factor to consider in determining whether granting leave to amend the *ad damnum* clause during the damages hearing would have so prejudiced the appellant as to have been an abuse of discretion.

There was evidence introduced at the hearing that could support a reasonable inference that the defendants—or at least some of them—contemplated when the Sales Contract was entered into that HAA intended to develop the property into a town house community and earn a profit by selling the town houses to buyers. The complaint did not suggest, however, that HAA was suing to recover the profit it had anticipated earning from those collateral sales. As noted, the complaint did not allege any facts having to do with lost profits from resales after development.

Moreover, the "estimated" $100,000 in damages requested in the *ad damnum* clause of the contract claim was not consistent with HAA's advancing a claim for lost profits from collateral sales. As the evidence adduced at the hearing made plain, the profit a developer would expect to realize from purchasing land and developing it into a town house community would far exceed $100,000. To the extent that the defendants were knowledgeable about the real estate market, and indeed were marketing the parcels for development, they would be knowledgeable enough to know that any such development would generate more than $100,000 in total profit for the developer. The estimate of $100,000 in damages would be far more consistent with recovery of money damages equal to an increase in the fair market value of the property from the time of contracting to the time of settlement, plus out-of-pocket expenses, than with recovery of lost profits from collateral sales. And HAA never amended its complaint to include allegations of fact pertaining to lost profits upon resale or to increase the amount of money damages demanded.

The case proceeded by way of default, without discovery or any pretrial proceedings other than a hearing on the appellant's motion to vacate; HAA's choice to pursue damages instead of specific performance first was made known to the

appellant (and the court) at the hearing on relief; and the amount of damages sought by HAA at the hearing was more than 18 times the amount stated in the complaint. Under these circumstances, it would have offended principles of fair notice and therefore been an abuse of discretion for the court to have allowed HAA to amend its complaint to increase the *ad damnum* clause during the evidentiary hearing on relief. *Cf. Park Avenue Lumber & Supply Co. v. Nils A. Hofverberg, Inc.*, 76 Ill.App.2d 334, 345, 222 N.E.2d 49 (1966) ("One has a right to assume that the relief granted on default will not exceed or substantially differ from that described in the complaint, and he may safely allow a default to be taken in reliance upon this assumption.").[4]

HAA advocated to the court, erroneously, that its *ad damnum* clause was worded so as to permit it to recover any sum of money greater than \$100,000; the court erred in ruling that that indeed was the case; the court was not required to grant leave to HAA to amend its complaint to increase the *ad damnum* clause; and, indeed, in the circumstances of this case, had HAA sought to amend its *ad damnum* clause at the relief hearing, the court would have abused its discretion by allowing it.

HAA did not offer any proof of direct lost profits, *i.e.*, the difference between the value of the Property on the date of the contract and on the date that settlement would have taken place. Rather, its evidence was probative of collateral lost profits, *i.e.*, the sums it would have realized as profit from the development of the Property into town houses. Therefore, to

---

**4.** We pause to emphasize that *Cole v. Gales, supra,* in which this Court held that a plaintiff, having obtained a default judgment, could amend the *ad damnum* clause of his complaint to add an amount of damages he had not known about, was contested at the damages inquisition phase of the case. Thus, the defendant was present and able to advocate against any amendment. We are not suggesting that it ever would be proper for a court to allow a plaintiff, having obtained a default order establishing liability, to amend upward his *ad damnum* clause when the defendant has not contested damages. In that circumstance, the only notice the defendant ever will have had of the amount of damages sought will have been the *ad damnum* clause of the complaint.

the extent that collateral lost profits are recoverable for the breach of a contract to sell land, had the court properly ruled on the *ad damnum* issue, HAA could have recovered $100,000 in damages, but no more. Accordingly, the court's error was prejudicial to the appellant, in that it resulted in an award of damages of $1.8 million dollars, instead of a maximum award of $100,000.

For the reasons we shall explain in Part II, we conclude that Maryland law does not prohibit recovery of damages for collateral lost profits in an action for breach of a contract to sell land. Therefore, our disposition will be to affirm the amount of the judgment up to $100,000 and to vacate the amount of the judgment above that sum.[5]

## II.

### Recovery of Damages for Collateral Lost Profits for Breach of Contract to Sell Raw Land

The appellant maintains that, as a matter of law, damages for collateral lost profits are not recoverable in a breach of

---

**5.** As we already have explained, before the 1984 revision to rule 2–341, and the 1998 "Committee note" addition to subsection (b) of that rule, post-trial pleading amendments were not permitted. When judgment was entered on a verdict that exceeded the *ad damnum* amount, the defendant's only recourse was to appeal. Unless the plaintiff elected, under what now is Rule 8–604(c), to save that part of the judgment that was within the *ad damnum* amount, the judgment would be reversed, without a remand for a new trial. After the rules were revised to allow post-judgment amendment of the *ad damnum*, clause, the issue became one of first decision by the trial court. If the trial court permitted an amendment, the *ad damnum* clause would be changed to conform to the verdict amount and judgment would be entered for the full amount of the verdict. If the trial court denied leave to amend (as would have been necessary here, if amendment had been sought), the trial court would enter as the amount of the judgment only that part of the verdict within the *ad damnum* clause. In this case, an amendment was not required, because amendment was not necessary under the trial court's erroneous ruling. Because the law now allows for amendment or revision of a verdict at the trial court level, Rule 8–604(c) no longer is the only means by which to save that part of a judgment within the *ad damnum* amount, and its existence does not prevent us from affirming the judgment in part, up to the amount of the *ad damnum*, without an election by HAA to do so.

contract action by a purchaser of real estate against a defaulting seller. HAA argues to the contrary.

### (a)

■ In a breach of contract action, upon proof of liability, the non-breaching party may recover damages for 1) the losses proximately caused by the breach, 2) that were reasonably foreseeable, and 3) that have been proven with reasonable certainty. *Impala Platinum, Ltd. v. Impala Sales, Inc.*, 283 Md. 296, 330, 389 A.2d 887 (1978); *Stuart Kitchens, Inc. v. Stevens*, 248 Md. 71, 74, 234 A.2d 749 (1967) (citing to RESTATEMENT (FIRST) OF CONTRACTS §§ 330, 331). In this context, "proximate cause" means losses that actually resulted from the breach. *See MLT Enters. v. Miller*, 115 Md.App. 661, 674, 694 A.2d 497 (1997) (stating that, whether a cause of action is in tort or contract, the plaintiff must prove that the defendant's breach of duty or contract was a proximate cause of the damages claimed).

■ With respect to reasonable foreseeability, Maryland follows the two-part principle established in *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145 (1854), for recovery of damages for breach of contract. *Winslow Elevator & Mach. Co. v. Hoffman*, 107 Md. 621, 69 A. 394 (1908) (*"Winslow Elevator"*). The first aspect of that principle holds that when a contract has been breached, the non-breaching party is entitled to damages for the breach " 'such as may fairly and reasonably be considered as arising naturally, *i.e.*, according to the usual course of things from such a breach of contract itself[.]' " *Id.* at 635, 69 A. 394 (quoting *Hadley, supra,* 9 Exch. 341, 354, 156 Eng. Rep. at 151). In other words, the plaintiff in a breach of contract action may recover general damages of the sort that are presumed to have been in the contemplation of the parties when the contract was made. *Id.*

■ Under the second aspect of the principle set forth in *Hadley v. Baxendale*, a plaintiff in a breach of contract action also is entitled to recover damages " 'such as may fairly and reasonably be supposed to *have been in the contemplation of*

*both parties* at the time they made the contract, as the probable result of the breach of it.'" *Winslow Elevator, supra,* at 635, 69 A. 394 (quoting *Hadley, supra,* 9 Exch. at 354, 156 Eng. Rep. at 151) (emphasis in *Winslow).* Such special or consequential damages are not presumed to have been in the contemplation of the parties when they made their contract but may be shown from evidence of the particular circumstances to have been in their contemplation. *See, e.g., Della Ratta, Inc. v. American Better Community Developers, Inc.,* 38 Md.App. 119, 138–39, 380 A.2d 627 (1977) (holding that profit losses were foreseeable to developer because developer "should have known that Della Ratta, as a contractor, entered into the building contract to make a profit"). *See* RESTATE-MENT (SECOND) OF CONTRACTS, section 351 (1981). *See also Munday v. Waste Mgmt. of N. America,* 997 F.Supp. 681, 685 (D.Md.1998) (applying Maryland contract law).

■ Finally, "reasonable certainty" of contract damages means the likelihood of the damages being incurred as a consequence of the breach, and their probable amount. Loss-es that are speculative, hypothetical, remote, or contingent either in eventuality or amount will not qualify as "reasonably certain" and therefore recoverable as contract damages. *Stuart Kitchens, supra,* 248 Md. at 74–75, 234 A.2d 749; *Kleban v. Eghrari–Sabet,* 174 Md.App. 60, 96, 920 A.2d 606 (2007).

■ The law of lost profits contract damages concerns itself primarily with "reasonable certainty" and to a lesser extent with foreseeability. Lost profit contract damages fall into two categories. "Direct profits" are those "that would have result-ed immediately from the performance of the contract broken." *M & R Contractors & Builders v. Michael,* 215 Md. 340, 347, 138 A.2d 350 (1958) (quoting Corbin, *Contracts,* (1951), § 1020). "Collateral profits" are those that would have result-ed not from the contract that was broken but from the loss of "'other contracts collateral to the one broken, contracts to which the defendant was not himself a party.'" *Id.* As early

as 1859, the Court of Appeals recognized that, upon breach of a contract, resulting collateral lost profits that

> ought to have [been] contemplated [by the other party], as a reasonable and probable result of his breach . . . will affect the measure of damages; . . . [and] in *some cases,* the profit that would have been derived from another contract, existing at the making of the one in suit, may be allowed.

*Abbott v. Gatch,* 13 Md. 314, 333–34 (1859).

In a purchaser's breach of contract action for failure to convey real property, a direct profit loss is the difference in fair market value of the property on the day settlement was to take place and the day the contract was made. Thus, if but for the seller's failure to convey as promised, the buyer would have owned property on the day of settlement that was worth more than it was worth on the day the contract was made, the buyer may recover that direct loss,[6] together with deposits paid, with interest, certain out-of-pocket expenses, and payments for rental for necessary substitute housing recoverable as consequential damages. These amounts comprise the buyer's loss of expectation interest ("benefit of the bargain") damages. *Beard v. S/E Joint Venture,* 321 Md. 126, 148, 581 A.2d 1275 (1990) (citing *Miller v. Talbott,* 239 Md. 382, 391–92, 211 A.2d 741 (1965)). *See Horner v. Beasley,* 105 Md. 193, 65 A. 820 (1907); *Hartsock v. Mort,* 76 Md. 281, 25 A. 303 (1892); *Clagett v. Easterday,* 42 Md. 617 (1875); *Cannell v. M'Clean,* 6 H & J 297 (1824).[7]

---

**6.** If the two figures are the same, or there is a deficit, the purchaser may recover nominal damages. *See, e.g., Bachewicz v. American Nat'l Bank & Trust Co.,* 126 Ill.App.3d 298, 81 Ill.Dec. 294, 466 N.E.2d 1096 (1984), *later proceeding,* 135 Ill.App.3d 294, 90 Ill.Dec. 388, 482 N.E.2d 95 (1985), *rev'd on other grounds,* 111 Ill.2d 444, 95 Ill.Dec. 827, 490 N.E.2d 680 (1986).

**7.** In *Beard, supra,* 321 Md. at 133, 581 A.2d 1275, the Court addressed an exception to the expectation interest rule that traces back to the English case of *Flureau v. Thornhill,* 2 W. Black. 1078, 96 Eng. Rep. 635 (K.B.1776). That exception restricts recovery by the purchaser to the return of the deposit paid, plus interest, and out-of-pocket expenses when the seller has acted in "good faith." Thus, the purchaser only may recover loss of expectation damages when the seller acted in "bad

█ "Collateral lost profits" in the context of a contract action by a buyer against a seller for failure to convey real estate are the profits the buyer anticipated earning upon resale of the property to another, or to several others. In the case at bar, HAA's damages evidence was offered to prove collateral lost profits: the loss of the profit HAA anticipated realizing from the resale of the land, after development, to fourteen town house purchasers.

In two Maryland appellate cases, both from the 19th Century, a purchaser under an executory contract for the sale of real property sued the seller for failure to convey, seeking as damages collateral lost profits. In both, the Court of Appeals held that, on the evidence adduced, damages for collateral lost profits were too speculative to be recoverable.

In *Clagett, supra,* 42 Md. 617, a purchaser contracted to buy a parcel of land, part of which was suitable for erecting a sawmill. The seller failed to convey that part of the property, and instead sold it to someone else. The purchaser sued to recover the profits he would have earned from operating the planned sawmill. In the meantime, the seller repurchased the land and offered to convey it to the buyer.

At trial, the court instructed the jury that it could award damages for the collateral lost sawmill operation profits. Upon a verdict in favor of the purchaser, the seller appealed, arguing *inter alia* that the court's damages instruction was an improper statement of the law.

The Court of Appeals reversed the judgment and remanded the case for a new trial. It held that the purchaser's claim for the loss of profits he would have realized from operating a sawmill at the site was "contingent, uncertain, remote, and altogether speculative." *Id.* at 627–28. The Court commented that, even if the entire parcel of land had been conveyed to begin with, as it should have been, "it [was]

faith" in refusing to convey. The Court in *Beard* explained that the *Flureau* exception only applies to situations in which the conveyance did not happen due to a problem with title; and that "bad faith" in this context is not limited to malice or fraud.

uncertain whether a mill would have been built, or, if built, that it would have obtained any custom or yielded any rents or profits to its owners." *Id.* The Court held, however, that the purchaser could recover damages for the fair rental value of the portion of the property at issue from the time it should have been conveyed to him, until the time that the seller offered to convey it to him; and that, in determining the fair rental value of that land during that period, the jury could take into consideration that the land could be used for a sawmill.

In *Lanahan v. Heaver,* 79 Md. 413, 29 A. 1036 (1894), a Baltimore City land owner contracted with a buyer, who also was a developer, to sell 27 unimproved lots on North Avenue. The contract called for the buyer to construct and sell row houses on the lots, and to receive an $800 bonus per lot from the land owner, as well as any profit from the sales of the finished row houses to new owners. The buyer purchased the land and completed construction of 22 row houses on the same number of lots. In the meantime, the City of Baltimore condemned the remaining 5 lots to use to extend Barclay Street to North Avenue, rendering them not buildable. The buyer recovered his lost $800 per house bonus for those 5 lots from the City. He then sued the land owner to recover the profits (over and above the $800 bonus) he would have realized from the sale of the row houses he had planned to build on those lots.

In a trial to a jury, the seller asked the court for an instruction that there was no evidence legally sufficient to support recovery of any sum other than nominal damages. The court denied the request, and the jury rendered a verdict in favor of the buyer for more than nominal damages. On appeal, the seller argued that the court erred by not granting its requested instruction.

The Court of Appeals agreed with the seller and reversed the judgment, without awarding a new trial. It did so based upon a failure of proof on the element of reasonable certainty of damages. The evidence adduced at trial showed only that,

of the 22 houses that had been constructed, 5 had been sold, 4 were being held on deposit, and 13 were unsold. There was no evidence to show 1) that the 5 houses that would have been built on the 5 lots in question, but were not, would have "sold any more readily than either of the thirteen yet undisposed of"; 2) when, "with any approximation to certainty," they would have been sold; 3) what expenses the buyer would have been incurring to maintain the lots prior to their eventual sales; and 4) what amount of profit the buyer expected to realize on the sales of those lots. *Lanahan, supra,* 79 Md. at 422–23, 29 A. 1036.

Judge McSherry (later Chief Judge), speaking for the Court, said:

> [T]here is not a particle of evidence to show, and from the very nature of things, there could not be any reliable evidence adduced to show, the price at which either of these five houses, had they been built, would have sold, assuming that they would have been sold at all; and there was no attempt to estimate their probable market value. Without some such evidence, it is simply impossible to form any judgment as to whether there would or would not have been profits arising out of the undertaking. In the absence of all evidence as to whether these five houses would ever have been sold; as to when they would have been sold, and as to what price they would have brought, any estimate of profits must necessarily be conjectural and speculative to the utmost degree; not because of the uncertainty as to amount of the profits, but because of the very obvious uncertainty as to whether there would have been any profits at all. It is the latter uncertainty or contingency which precludes a recovery of profits alleged to have been lost.

*Id.* at 423, 29 A. 1036.

Decades later, in *M & R Contractors, supra,* at 346–47, 138 A.2d 350, the Court of Appeals clarified the proof required for recovery of collateral lost profits in a breach of contract action. That case was an action to recover direct (not collateral) lost profit damages for breach of a construction contract. The

Court explained that the usual three elements of damages must be required to recover lost profits, generally: proximate cause of the loss; that, when the contract was executed, the defendant reasonably could have foreseen that the loss of profits would be a probable result of the breach; and that the lost profits were reasonably certain to occur. The Court drew a distinction between the proof necessary to recover collateral lost profits and that necessary to recover direct lost profits, emphasizing that the latter is less strict:

> [A] plaintiff is less likely to be permitted to show that the breach has caused him to be unable to make or perform other contracts collateral to the one broken, contracts to which the defendant was not himself a party. The profits from these contracts may be regarded as too remote or too speculative.

*Id.* at 347, 138 A.2d 350 (quoting 5 Corbin, *supra*, § 1020).

In Maryland, since *M & R Contractors* was decided in 1958, there has not been a reported appellate opinion addressing the recovery of collateral lost profits in an action for breach of a contract to sell real estate. In 1971, the Court of Appeals decided two cases that arose out of real estate transactions, but were not actions for breach of contract to convey real property, in which the plaintiffs sought to recover collateral lost profits as damages. Both held that the evidence was legally insufficient to permit recovery because it did not satisfy the "reasonable certainty" element of contract damages.

In *Reighard v. Downs,* 261 Md. 26, 273 A.2d 109 (1971), a buyer contracted to purchase a large tract of land to develop into a residential subdivision. He hired a surveyor to calculate the acreage of the tract, and then used the surveyor's findings to plan the subdivision. After settlement, the buyer discovered that the surveyor carelessly had transposed some numbers in making his acreage calculation, and the land the buyer purchased was about 2½ acres less than what he thought he had purchased. The buyer sued the surveyor for professional negligence. He sought to recover, as collateral lost

profits, the sums he would have earned if he indeed had purchased the additional 2½ acres he thought he was purchasing, but for the surveyor's negligence, and had built and resold houses on that additional land.

At trial, the purchaser qualified as an expert in real estate transactions. By that time, he had completed development of the subdivision. He used the amount of profit he had realized from the construction and sale of houses in the subdivision to opine about the fair market value of the 2½ phantom acres of property that were not conveyed, because they did not exist. In particular, he sought to recover the lost profits he would have earned from the hypothetical contracts for resale of houses he would have constructed on the 2½ acres, had they existed. He used the evidence of the profit he already had realized on those resales to calculate the unrealized resale profit he had lost for the 2.5 acres of land that were not, but should have been, conveyed. The trial court granted a motion to strike the testimony about lost profits.

On appeal, the Court reversed on other grounds, but ruled that the lower court correctly had rejected the lost profits evidence. Emphasizing that the buyer's damages claim fell within the "collateral profits" category delineated in the decision in *M & R Contractors, supra,* 215 Md. at 347, 138 A.2d 350, it concluded that the buyer's proof was too "conjectural and speculative" to allow recovery. After noting that the buyer did not have an adequate factual basis for his opinion about the fair market value of the hypothetical remaining lots, the court went on to state the following about the buyer's lost collateral profits claim:

> [The defendant's] computation of loss here is predicated upon the hypothesis that had he had in his possession the additional two and a half acres which he thought he was buying that this would have worked out to the same return per acre. The various plats submitted show an extensive easement for drainage and they show various attempts to work out streets for the subdivision. Therefore, it just does not follow as a matter of mathematics that the return would have been the same.

*Reighard, supra,* 261 Md. at 35, 273 A.2d 109. The Court then quoted at length Judge McSherry's observations in *Lanahan* about conjecture, speculation, uncertainty, and contingency precluding recovery of collateral lost profits. *Id.* at 35–36, 273 A.2d 109.

Similarly, in *St. Paul at Chase Corp. v. Manufacturers Life Insurance Co.,* 262 Md. 192, 278 A.2d 12 (1971), an owner and developer of land in Baltimore City sued a lender for failure to furnish financing as the lender had agreed to do. The owner had purchased the property in order to construct a high-rise apartment building. Because of the lender's breach of the financing contract, the construction was delayed. In its suit against the lender, the owner sought to recover as damages the profits it would have earned from rents paid by tenants of the apartment building during the delay in construction period. The Court held that these collateral lost profits were too remote and speculative to be recoverable.

In the late 1970's, in breach of contract cases not involving the sale of real estate, or having any connection to real estate transactions, the Court of Appeals and this Court approved the recovery of collateral lost profits upon proof by the plaintiff that the collateral contracts with third parties already were in hand at the time of the breach.

In *Impala Platinum, Ltd. v. Impala Sales, Inc.,* 283 Md. 296, 389 A.2d 887 (1978), a purchaser of platinum products sought to recover lost profits it had sustained as a result of the seller's having breached a supply contract. The purchaser introduced expert testimony to prove the loss of business it had sustained as a consequence of the supplier's not having honored the supply contract. It appears, although it is not completely clear from the opinion, that the sales the purchaser lost were under contract before the supplier failed to deliver, *i.e.,* that the lost profits were collateral, but arose from the inability to deliver upon already-existing resale contracts. The Court of Appeals affirmed the ruling permitting the purchaser to recover damages for lost profits resulting from the supplier's breach of contract.

In *John D. Copanos & Sons, Inc. v. McDade Rigging and Steel Erection Company, Inc.,* 43 Md.App. 204, 403 A.2d 402 (1979), the plaintiff, a pharmaceutical company, contracted with the defendant to move a newly-purchased capsule machine to its plant. During the move, the defendant's forklift knocked the machine into a wall, destroying it. The plaintiff company sued for breach of contract, claiming, *inter alia,* damages for collateral lost profits. Specifically, the plaintiff offered evidence that, as a result of the machine's being out of commission for three months, it lost customers that previously had entered into contracts to purchase large quantities of capsuled penicillin, and in turn had lost the anticipated profits on those sales. The trial court disallowed this evidence upon a finding that because selling encapsulated pharmaceuticals was a new venture for the plaintiff the lost profits sought were too speculative to permit recovery.

In reversing, this Court explained that the critical inquiry was not solely whether the business was old or new but whether the lost profits "[could] be shown with reasonable certainty." *Id.* at 208, 403 A.2d 402. Recognizing that the claimed lost profits were "collateral," we observed that "[t]he mere circumstance that more stringent proof is required where the anticipated profits stem from collateral transactions does not warrant a prohibition on such proof." *Id.* at 210, 403 A.2d 402. After considering the plaintiff's proffer, which included evidence that its third-party contracts were cancelled as a consequence of the destruction of the machine, we concluded that the plaintiff's collateral lost profits evidence was not too speculative to allow recovery. *Cf. Crabbs v. Koontz,* 69 Md. 59, 61, 13 A. 591 (1888) (holding that plaintiff's evidence, consisting of the opinions of witnesses that defendant's wrongful possession of plaintiff's thresher caused plaintiff to lose profits that would have come from gathering grain and selling it was "wanting in the element of certainty which the law requires as the basis for estimating damages.").

Finally, more than twenty years ago, this Court affirmed a ruling granting damages for collateral lost profits in a case that, like *St. Paul at Chase, supra,* 262 Md. 192, 278 A.2d 12,

arose out of a breach of a financing contract that resulted in a delay in construction of a residential subdivision. In *Sergeant Co. v. Clifton Building Corp.*, 47 Md.App. 307, 423 A.2d 257 (1980), the defendant, a subsidiary of a savings and loan company, contracted with the plaintiff, a construction company, to furnish permanent financing to prospective buyers of houses the plaintiff was building. The defendant breached the contract after the plaintiff had secured sales contracts for 13 homes, all contingent upon financing being provided by the defendant. After the breach, nine of the buyers backed out. Relying upon *Copanos*, this Court held that the evidence of collateral lost profits from the nine contracts was sufficient to meet the "reasonable certainty" standard of proof requirement. *Sergeant Co., supra,* 47 Md.App. at 318, 423 A.2d 257.

#### (b)

Courts in many states have held that, in a breach of contract action for failure to convey real estate, evidence that the plaintiff/buyer had in hand a contract for resale to a third party is sufficient to prove collateral lost profits with reasonable certainty. *See Lynch v. Wright,* 94 F. 703 (C.C.S.D.N.Y. 1899); *Basiliko v. Pargo Corp.,* 532 A.2d 1346 (D.C.1987); *Annon II, Inc. v. Rill,* 597 N.E.2d 320 (Ind.Ct.App.1992); *Rosenberg v. Derbes,* 165 La. 407, 115 So. 637 (1928); *McVay v. Castanera,* 156 Miss. 785, 126 So. 832 (1930); *Kerrey Constr. Co. v. Hunt,* 213 Neb. 776, 331 N.W.2d 519 (1983); *Donovan v. Bachstadt,* 91 N.J. 434, 453 A.2d 160 (1982). In these cases, the existence of the third party contract serves as adequate proof of the likelihood that a collateral profit would have been earned, and the substance of the third party contract allows for reasonably precise calculation of the amount of the collateral profit lost. *See, e.g., Rosenberg, supra,* 165 La. at 409, 115 So. 637. (In some jurisdictions, lost profits are not recoverable, but evidence of the buyer's resale contract price may be used to show the fair market value of the property for purposes of calculating expectation interest damages. *See Lynch, supra,* 94 F. at 704–05; *Basiliko,*

*supra,* 532 A.2d at 1350; *Annon II, Inc., supra,* 597 N.E.2d at 326.)

In *Republic Nat. Life Insurance Co. v. Red Lion Homes, Inc.,* 704 F.2d 484 (10th Cir.1983), the Tenth Circuit Court of Appeals, sitting in diversity jurisdiction, affirmed an award of collateral lost profits for breach of a contract to sell real estate when, at the time of the breach, the non-breaching buyer did not have any third party resale contract in hand. *Id.* at 491. The seller was an insurance company in possession of 92 undeveloped lots in Colorado. It entered into a contract with the purchaser that called for the seller to make certain improvements to the land (curbs, sewer and water extensions, street lighting, grading, and paving), and then to sell the improved land to the purchaser on a designated settlement date. The seller experienced delays and did not complete the required improvements until two years and three months after settlement was to have occurred. When the seller demanded that the buyer move forward with the purchase, the buyer refused to purchased the improved lots, and sued the seller for collateral lost profits. *Id.* at 485.

The district court found that the seller had breached the contract to convey the improved lots. *Id.* at 485–86. It awarded the buyer damages for the profit it would have realized from building and selling houses on the lots. After noting that, under Colorado law, the ordinary measure of damages for breach of an agreement to convey real estate is benefit of the bargain damages, the court explained that, when the parties know that a breach of the contract will cause "special or unusual harm," and the damages claimed are not uncertain or remote, collateral lost profits may be awarded. *Id.* at 488. The district court found that the defendant was aware that the plaintiff had planned to build homes on the lots and therefore knew that "if it failed to convey the land in the condition agreed upon it would deprive the plaintiff of the opportunity to build the houses, and hence of the profit the plaintiff would earn by so building." *Id.* at 489.

The court concluded that projected lost profits were not too speculative to permit recovery based upon the evidence at trial that the plaintiff was prepared to complete the development project and had experience as a developer; and that a "rudimentary market analysis" combined with past experience suggested that the houses would have sold easily and at a profit. *Id.* at 489–90. *See also* Williston *Contracts,* § 66:81 Purchaser's Damages (explaining that a purchaser may recover collateral lost profits against the seller of real property, as a result of the breach, "such as through resale of the property, if [the collateral lost profits] were within the contemplation of the parties at the time of contracting, and they are proven to be more than speculative, remote, or contingent." (footnotes omitted)).

In *Gilmore v. Cohen,* 95 Ariz. 34, 386 P.2d 81 (1963), by contrast, the Supreme Court of Arizona affirmed the lower court's decision that lost profits for a breach of an option contract to sell land were not proven with sufficient certainty to permit recovery. The parties had entered into a contract that gave the plaintiffs an option to buy 13 parcels of land. The purchasers were residential developers and contractors. Their purchase option would remain open so long as they purchased at least one parcel every ninety days. After they purchased six parcels, the sellers refused to make any more sales. By then, the purchasers had built homes on the six parcels they have bought, and had sold each one at a profit.

The purchasers sued the sellers for breach of the option agreement, seeking to recover damages for their anticipated lost profits from the resales of the houses they would have built on the remaining parcels. They argued that the evidence of the profits they had earned on the houses they had built and resold was sufficient to establish with reasonable certainty that they would have earned such a profit on the houses they had planned to build on the lots the sellers had refused to convey.

The only evidence presented by the plaintiffs at trial as to the lost profits was their own testimony. The court noted that

"[n]o books of account or other record of the costs of developing the first six tracts and their selling price were introduced." *Gilmore, supra,* 95 Ariz. at 36, 386 P.2d 81. It then suggested that, even if formal accounts had not been maintained by the plaintiffs, they could have submitted income tax returns or other "informal memoranda" as proof of profits. *Id.* Finally, there was some ambiguity in the testimony as to whether any profit was realized on the six parcels that were sold. The court affirmed the judgment on the basis that the lost profits sought were too speculative to permit recovery.

### (c)

We now return to the case at bar. At the damages hearing, HAA sought to recover collateral lost profits, *i.e.,* the profits it anticipated it would have realized upon sale of the 14 town houses it planned to construct on the property, and would have constructed but for the appellant's (and the other defendants') breach by failure to convey.

The evidence adduced plainly was sufficient to satisfy the proximate causation element of breach of contract (which was established by default in any event). *See also Rumsfeld v. Applied Cos. Inc.,* 325 F.3d 1328, 1339 (Fed.Cir.2003), and *Scott Timber Co. v. United States,* 64 Fed.Cl. 130, 137–38 (2005) (both explaining in the context of lost profits recovery for breach of contract evidence must show that breach was a substantial factor in causing the loss).

Likewise, the evidence plainly was sufficient to satisfy the consequential damages foreseeability requirement of *Hadley v. Baxendale.* The appellant and her co-defendants marketed the property for sale for development into a town house community. It was expressly within the contemplation of the appellant and her co-defendants that the property, which was raw land, would be purchased in order to build up to 15 town houses on it, for resale. Because it was clear (and undisputed) that the appellant and the other defendants knew that The Ezra Company was purchasing the parcels to construct a town house community, it was not necessary for HAA to specially plead collateral lost profits in its suit. *See, e.g., Bird Lakes*

*Dev. Corp. v. Meruelo,* 626 So.2d 234 (Fla.App. 3rd Dist.1993) (holding that real property purchaser did not have to specially plead lost profits when seller knew about the purchaser's development plans for the property).

■■■■ The contract of sale the appellant and her co-defendants received was from The Ezra Company, an established residential real estate developer in Montgomery County. Thus, there was proof that, upon entering into the contract of sale, it was in the contemplation of both parties that, once sold to HAA, the parcels would be developed as a town house community. *Compare Spangler v. Holthusen,* 61 Ill.App.3d 74, 82, 18 Ill.Dec. 840, 378 N.E.2d 304 (1978) (in failed real estate transaction, buyer could not recover profits he lost on a collateral contract for immediate resale of the property, in an action for breach of contract against the seller, when the contract between the buyer and the seller was an installment contract under which buyer would not take possession of the property for ten years and there was nothing else known to the seller that would lead him to think the buyer planned to immediately resell the property; general knowledge by the seller that the buyer developed land and might sell off part of the property to others during the ten year term was "insufficient to charge the [sellers] with knowledge of and liability for the unusual loss of profits claimed here.").

The focus of the appellant's damages argument on appeal, and the more difficult question, is whether HAA's evidence was sufficient to meet the "reasonable certainty" contract damages requirement, as it is strictly applied for recovery of collateral lost profits. HAA did not introduce into evidence any already-existing re-sale contracts for the town houses it had planned to build on the two parcels; and indeed its evidence showed that, when it contracted to purchase the property, it only was in the planning stage for the development and was not at a point farther along in the development process when it actually would be entering into the collateral re-sale contracts from which its profits would be generated. Nor did HAA present evidence that, notwithstanding that it

did not have any resale contracts in hand, it had lined up firm buyers for the planned town houses. This case is therefore unlike those Maryland cases discussed above that have permitted lost profits recovery, under the reasonable certainty standard, upon proof of already-existing collateral resale contracts.

Nevertheless, HAA moved into evidence facts showing that The Ezra Company was an established home construction company in the Montgomery County area, where the property was located, with a 25-year track record of developing residential properties, including town house communities; and that The Ezra Company had the capacity and experience to undertake and complete the planned town house project. Thus, the evidence established a past track record for The Ezra Company, and therefore for HAA, of building precisely the type of houses that, when the parties made their contract, they contemplated eventually would be built, and then sold, on the property after sale.

As explained, prior Maryland case law on collateral lost profits outside the realm of real estate contracts has held that evidence of the existence of third party contracts at the time of the making of the contract at issue is sufficient to make collateral lost profits reasonably certain and not too speculative to be recoverable. The cases do not hold, however, that such evidence is necessary to the recovery of collateral lost profits, *i.e.*, that without evidence of third party contracts in hand when the contract at issue is made, collateral lost profits are not recoverable. The case at bar is an example of evidence of track record and experience on the part of the non-breaching party sufficient to make the collateral lost profits damages sought reasonably certain and not speculative, and therefore (because the other requirements for recovery were met), recoverable.

The nature of the residential real estate development business ordinarily does not allow for developers to have resale contracts in hand before the land on which they plan to build is purchased. Real estate is unique, and certainly is not

fungible as are products sold under standing supply contracts. In the case of sales of non-unique products such as minerals and medicines, distributors can secure resale contracts before entering into supply contracts. That is not possible in the real estate market. Barring an unlikely situation, such as existed in *Gilmore,* in which a part of the land in question was conveyed and developed, and a part was not, it is unlikely that a developer such as The Ezra Company ever would have already-existing resale contracts for town houses before purchasing the property on which the town house community will be built.

Maryland law of contract damages does not prohibit recovery of collateral lost profits in general or in actions for breach of contract to convey real property. Rather, it requires that a plaintiff to recover damages prove proximate causation, foreseeability, and reasonable certainty; and in collateral lost profit cases, it strictly applies those requirements, particularly that of reasonable certainty. Therefore, the collateral lost profits issue the appellant raises is a question of the legal sufficiency of HAA's proof.

In the case at bar, HAA presented evidence that the property in question was marketed for sale for the purpose of developing town houses, and that that purpose was in the contemplation of both parties when the contract was made. It also presented evidence through Mark Ezra that it had an established track record in Montgomery County as a developer of residential communities such as the town house community the parties expected would be built on the property after it was conveyed to HAA. Finally, it presented expert witness testimony about the costs it likely would have incurred in developing the land into a community of 14 town houses, the probability of the completed town houses being sold in that area of Montgomery County, the prices the finished town houses would have fetched on the real estate market as it existed at the relevant time, and the profit that would have been returned to HAA on the expected sales. This evidence, which was unrefuted and unchallenged, was legally sufficient

to prove that HAA sustained collateral lost profits due to the breach of contract to convey the property.[8]

## III.

■ The appellant complains that the trial court entered a monetary judgment against her in her capacity as a partner in AVGP without first "marshalling the assets" of the partnership.

As explained previously, the five partners in AVGP are the appellant, Thanh Hoang (her husband), Hao Vu, Van Vu, and Ruby J. Jacobs. All five were sued individually and in their capacities as general partners in AVGP. AVGP also was sued. Default judgments were entered against all of them. Ultimately, the judgments against Hao Vu, Van Vu, and Jacobs were vacated and the claims against them were voluntarily dismissed with prejudice. (A default judgment also was entered against Thinh Q. Vu, not an AVGP partner, and then vacated, and the claims against him voluntarily dismissed with prejudice.) The appellant noted a timely appeal to this Court. *See* n. 3 *supra.* Neither AVGP nor Thanh Hoang, the only remaining defendants, noted an appeal from the judgments against them.[9]

Pursuant to CJ section 6–406(a), a partnership may be sued in the partnership's name "on any cause of action affecting the common property, rights, and liabilities of the group." Thus, it is no longer required, as it once was, that all partners be joined in a contract action against a partnership. *Hartford Accident and Indemnity Co. v. Scarlett Harbor Assoc. Ltd.*

---

8. We note that the Sales Contract provided in paragraph 25, entitled "Default," that, "[i]f the Seller fails to complete Settlement, the Purchaser will have all legal or equitable remedies, including specific performance and/or damages." The appellant, as Seller, could have negotiated a narrow definition of "damages" to exclude collateral lost profits, but did not do so.

9. Thanh Hoang, like the appellant, filed a petition for bankruptcy under Chapter 7. He did not file the petition within the time for noting an appeal from the default judgment in this case, however, and never noted an appeal in this case in any event.

*P'ship,* 109 Md.App. 217, 268–69, 674 A.2d 106 (1996). Also, pursuant to CJ section 6–406(b), an action against a partnership "[h]as the same force and effect with respect to the common property, rights, and liability of the group as if all members of the group were joined," and "[d]oes not abate because of any change in membership in the group or its dissolution."

 Furthermore, Md.Code (1997) section 9A–307(b) of the Corporations and Associations Article ("CA"), allows an action "against [a] partnership and [with an exception not applicable here], any or all of the partners in the same action or in separate actions." Pursuant to CA section 9A–307(b), "[a] judgment against a partnership is not by itself a judgment against a partner. A judgment against a partnership may not be satisfied from a partner's assets unless there is also a judgment against the partner." Also, under the equitable doctrine of "marshalling of assets," "partnership assets are applied first to the discharge of partnership liability. (Citations omitted.) Thus, a partnership creditor cannot reach the partners' personal assets unless the partnership assets are first exhausted or there is no effective remedy without resort to the individual partners' property." *Hartford Accident and Indemnity Co., supra,* 109 Md.App. at 269–70, 674 A.2d 106.

 In Maryland, in a civil action, the disposition on appeal of a judgment as to one party does not affect a judgment against another party to the same case who did not note an appeal. *Nowell v. Larrimore,* 205 Md. 613, 623, 109 A.2d 747 (1954); *Benson v. Atwood,* 13 Md. 20, 57–58 (1859); *Lanahan v. Latrobe,* 7 Md. 268, 272 (1854); *Leadenham's Ex'r v. Nicholson,* 1 Har. & G. 267, 279 (1827). *See also* Rule 8–602(a) (listing the possible dispositions that the appellate court shall make "as to each party *to an appeal*" (emphasis added)). The appellate court has the authority to dispose differently of judgments against multiple appellants in the same appeal and has discretion to reverse a judgment as to one appellant, when it could be affirmed, when it may have been tainted by improper judgments against other appellants. *See Schloss v. Silverman,* 172 Md. 632, 643–45, 192 A. 343 (1937) (reversing

judgment without new trial against partnership and one partner, for insufficient evidence, and reversing judgment against other partner, against whom evidence was sufficient, because to do so would promote the ends of justice). However, when judgments are entered against multiple parties, but not all of them pursue an appeal, the appellate court cannot alter a judgment against a party who did not note an appeal.[10] Indeed, the jurisdiction of this Court is conferred by statute, and a party must file a timely notice of appeal from the judgment against it to invoke appellate jurisdiction to review that judgment. *See* CJ § 12–301; Rule 8–201(a).

In the case at bar, we have modified the judgment against the appellant to conform to the $100,000 *ad damnum* clause of HAA's complaint and have vacated the amount of a judgment against her above that sum. The judgments against Thanh Hoang and AVGP, having not been appealed, are not affected by the disposition of this appeal, and stand. After the assets of AVGP have been exhausted as to the judgment against it, under the equitable doctrine of "marshalling assets," the personal assets of the appellant, up to $100,000, will be subject to collection to satisfy the judgment against AVGP.

## IV.

In Question IV, the appellant asked whether the trial court erred by not reducing its $1.8 million award to present value.

---

**10.** Some jurisdictions apply the principle, usually adopted by rule, that an appellate court's reversal or modification of a judgment as to an appealing party will not inure to the benefit of a nonappealing coparty unless the judgment was rendered against parties having a united and inseverable interest in the judgment's subject matter, which itself permits no inconsistent application among the parties.... On rare occasions, the grant of full relief to the appealing party may necessarily entail granting relief to a nonappealing party. *Hecht v. City of New York*, 60 N.Y.2d 57, 61–62, 467 N.Y.S.2d 187, 454 N.E.2d 527 (1983) (citations omitted). Maryland appellate courts never have adopted that principle, or considered it. In any event, because HAA elected to pursue damages instead of specific performance, the interests of AVGP and the appellant, and the interests of Thanh Hoang and the appellant, are not united and inseverable with respect to the subject matter of the judgments against them.

Our disposition of questions I and II have rendered Question IV moot.

## V.

Finally, the appellant takes issue with the court's award of counsel fees and expert witness fees. The appellant did not raise this issue below. Accordingly, it is not preserved for review and we shall not address it. Md. Rule 8–131(a).

**JUDGMENT. FOR $1,889,755.98 AGAINST MINH–VU HOANG MODIFIED TO JUDGMENT FOR $100,000; JUDGMENT OTHERWISE AFFIRMED. COSTS TO BE PAID ONE–HALF BY MINH–VU HOANG AND ONE–HALF BY HAA.**