14 A.3d 6

**David SIMARD**

v.

**John S. BURSON, et al.**

**No. 1302, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Feb. 25, 2011.

398

Byron L. Huffman, Columbia, for appellant.

Richard W. Drury (McMullen & Drury P.A., on the brief), Towson, for appellee.

Panel: WOODWARD, WRIGHT, RAYMOND G. THIEME, JR. (Retired, Specially Assigned), JJ.

WOODWARD, J.

The appeal in the instant case calls upon this Court to decide a question of first impression in Maryland regarding the extent of the liability of a defaulting purchaser at a foreclosure sale. In February 2007, John S. Burson, William M. Savage, Jason Murphy, Kristine D. Brown, and Gregory N. Britto, Substitute Trustees under a Deed of Trust covering the real property, with improvements, known as 403 Cherry Hill Road, Reisterstown, Maryland ("the Property"), sold the Property at a foreclosure sale. Appellant, David Simard, made the highest bid of $192,000, which was accepted by Substitute Trustees and subsequently ratified by the Circuit Court for Baltimore County ("Original Sale"). Simard, however, failed to go to settlement, and the circuit court ordered the Property resold ("First Resale"). In October 2007, Stan Zimmerman purchased the Property at the First Resale for $163,000, but he too failed to go to settlement after the court ratified the sale. The court then ordered a second resale of the Property ("Second Resale"). In June 2008, JBJ Real Estate LLC ("JBJ") purchased the Property at the Second Resale for $130,000, and completed the sale after ratification by the court.

In the audit on the sale of the Property, the auditor allocated the cost of the difference ("shortage" [1]) between the Original Sale price of $192,000 and the Second Resale price of $130,000 to be paid by Simard. Simard filed exceptions to the audit, arguing that he should be liable for only the shortage between the Original Sale price of $192,000 and the First Resale price of $163,000. The circuit court ultimately overruled Simard's exceptions, ratified the audit, and denied Simard's motion for reconsideration.

---

1. As employed by the Court of Appeals, we will use the term "shortage" to "refer to any negative difference in the prices obtained at the [ ] foreclosure sale and at the resale.... [T]he defaulting purchaser ... assumes the risk upon resale that there will be a 'shortage' between the price at the first sale and the price at the second sale." *Simard v. White,* 383 Md. 257, 301, 859 A.2d 168 n. 21 (2004).

On appeal, Simard presents one question for review by this Court: "Is the first foreclosure purchaser who defaults liable for all deficiencies occasioned [by] subsequent resales of the foreclosed property after successive defaults in resales of the property?"

For the reasons set forth herein, we shall reverse the circuit court's judgment and remand for further proceedings.

## *BACKGROUND*

On January 30, 2007, the Substitute Trustees instituted foreclosure proceedings in the Circuit Court for Baltimore County against Betty L. James ("Betty"), the owner of the Property, because of a default in payment of a loan secured by the Deed of Trust covering the Property. According to the record, Betty had passed away on November 17, 2004. The Substitute Trustees, however, instituted foreclosure proceedings against Betty, and not against her daughter, Michelle James ("Michelle"), who had been appointed Personal Representative of Betty's estate on or about November 29, 2004.

The Substitute Trustees sold the Property at the Original Sale to Simard on February 28, 2007 for $192,000. On April 16, 2007, the circuit court signed an order ratifying the Original Sale. Simard failed to go to settlement and on May 25, 2007, the Substitute Trustees filed a petition with the court to order the First Resale of the Property "at the sole risk and expense of the defaulting purchaser," Simard. On May 25, 2007, the court issued a show cause order, notifying Simard and Betty of the petition and ordering them to file their written objections, if any, to the petition by June 21, 2007. Neither Simard nor Michelle, as Personal Representative of Betty's estate, filed written objections. On August 1, 2007, the court ordered the Property to "be resold at the risk and expense of the defaulting purchaser, DAVID SIMARD."

On October 16, 2007, the Substitute Trustees sold the Property at the First Resale to Zimmerman for $163,000. The court ratified the sale on January 2, 2008.

On March 24, 2008, the Substitute Trustees petitioned the court to order the Second Resale of the Property at "the sole risk and expense of the defaulting purchaser," because "the Substitute Trustee [sic] ha[d] requested the purchaser(s) to go to settlement but said purchaser(s) [had] not done so." On March 28, 2008, the court issued a show cause order, notifying Zimmerman and Betty of the petition and ordering them to file their written objections, if any, to the petition by April 18, 2008. Neither Zimmerman nor Michelle, as Personal Representative of Betty's estate, filed written objections. On May 5, 2008, the court ordered the Second Resale of the Property "at the risk and expense of the defaulting purchaser, STAN ZIMMERMAN BY BORIS BRAUN."

On June 12, 2008, the Substitute Trustees sold the Property to JBJ for $130,000 at the Second Resale, and the court ratified the sale on July 24, 2008. On September 8, 2008, JBJ complied with the terms of sale by completing settlement.

On January 6, 2009, Michelle was removed as Personal Representative of Betty's estate by the Orphans' Court for Baltimore County for failure to file a Second Administration Account. That same day appellee, Alexander McMullen, III, Esq., was appointed Special Administrator of Betty's Estate.

On February 10, 2009, the court appointed auditor filed an audit for the foreclosure sale of the Property. The auditor allocated the shortage of $62,000 between the Original Sale price of $192,000 and the Second Resale price of $130,000 to be paid by Simard; in other words, the auditor allocated the full shortage to Simard. The auditor also allocated the shortage of $33,000 between the First Resale price of $163,000 and the Second Resale price of $130,000 to Zimmerman.

In response to the audit, Simard filed exceptions on February 20, 2009, arguing that "[t]he ratification of the [First Resale] effectively released [ ] Simard from any further liability after [the First Resale on] October 16, 2007, by accepting the performance of [Zimmerman]"; that "[a] resale order cannot have the effect of holding a foreclosure purchaser for all losses through multiple resales of a property"; and that

"[t]he damages from the [First Resale] were caused by [Zimmerman], not [ ] Simard," so that the damages therefore were "too remote to be attributable to [ ] Simard." No opposition to Simard's exceptions was filed by any party.[2] By order dated February 23, 2009, and filed on February 24, 2009, the court ratified the audit. Notwithstanding the filing of exceptions by Simard, the court's order ratifying the audit stated that "no cause to the contrary" had been shown to such ratification.

On March 10, 2009, Simard filed a motion to reconsider and vacate the ratification of the auditor's report. In his motion, Simard contended that the court's order ratifying the audit was "insufficient to show that the Court read and considered the Exceptions of [ ] Simard to the Audit." Simard also claimed that a copy of the order ratifying the audit had not been mailed to his attorney, whose appearance had been entered in the case, and that such irregularity was "in itself [ ] a reason to vacate and, if warranted, to re-enter the ratification of the Audit, which resets the time for motions for reconsideration of the relief granted and the times for appeal."

The subsequent procedural history is recounted in the parties' agreed statement of facts, as set forth in Simard's brief in this Court:

1. A hearing was held on the Exceptions and Motion for Reconsideration on April 20, 2009, the Hon. Lawrence R. Daniels, Judge, presiding.... It was determined preliminarily that [JBJ] had no interest which could be affected by the proceedings, and it was excused from the hearing. This matter is of no controversy in this appeal.

m. Alexander R. McMullen, III, Esq., Special Administrator of the Estate of ... Betty L. James, deceased, was present at the hearing and participated in it.

---

2. On March 19, 2009, JBJ filed a response to Simard's exceptions, in which JBJ asserted that it did not default and thus should not be held responsible "for any shortfall in the realized sums after sale of the Property." Simard never contended that JBJ was in any way responsible for the shortages arising from the First and Second Resales.

n. ... There was no dispute as to the arithmetical accuracy of the Audit. [ ] Simard through counsel stipulated to his responsibility for the [shortage] from the First Resale determined by subtracting the [shortage] from the Second Resale from the [shortage] from the initial sale through the Second Resale as calculated by the Auditor.

o. The parties agreed with the Court that the principles in resolving the liability of the original foreclosure sale purchaser for all the deficiencies following serial defaults appeared to be a case of first impression in Maryland.

p. The parties further agreed that there [were] no facts in dispute, and that the issue before the Court was what law should be applied to the facts of the case.

\* \* \*

t. In his oral ruling, Judge Daniels denied the exceptions of [ ] Simard upon the grounds of the foreseeability of the loss and ordered the vacation and re-ratification of the audit. This oral ruling was followed up by three written orders to give effect to it.

u. On May 4, 2009, [ ] Simard filed a Motion for Reconsideration of the denial of his Exceptions and (re-)Ratification of the Audit, to which [ ] McMullen filed an Opposition.

v. By Order dated June 24, 2009, and entered July 10, 2009, Judge Daniels denied the Motion for Reconsideration.

w. [ ] Simard timely noted this appeal on August 10, 2009.[3]

Additional facts will be discussed below as necessary to resolve the question presented.

## THE PARTIES' CONTENTIONS

### Simard's Contentions

Simard contends that Maryland Rule 14–305(g) "only contemplates a solitary resale at the 'risk and expense' of 'the

---

**3.** Thirty days from July 10, 2009 was August 9, 2009, which was a Sunday. Under Md. Rule 1–203(a), Simard had until the next day, August 10, 2009, to timely note the appeal in the case *sub judice*.

purchaser,'" and not successive resales. Simard specifically points to the petition for the Second Resale and the court order thereon in the case *sub judice* to conclude that "the Second Resale was held not at [his] risk and expense," but at Zimmerman's risk and expense. Simard concludes by suggesting the following principle be applied to the instant case: "If the second resale should bring less than the first resale, it is the second purchaser who should bear that loss because that loss was caused by that person." [4]

Simard also contends that under general contract principles, he "should be held liable only for the results of the [F]irst [R]esale" and not from any subsequent resales, because "the deficiencies resulting from successive resales result from the acts of persons over whom a defaulting purchaser has no control, thus resulting in losses too remote to be said to be caused by the defaulting purchaser." According to Simard, even if the trial court was correct in its conclusion that "a larger loss from the second resale was 'foreseeable'," the losses resulting from successive resales were "caused by persons other than the person sought to be held liable."

## Special Administrator's Contentions [5]

McMullen, as Special Administrator of Betty's estate, responds that "[t]he circuit court was correct in determining that under Maryland Rule 14–305(g) all losses that result from the resale of a foreclosed property remain at the risk and loss

---

4. Simard also suggests two other "approaches," neither of which are applicable to this appeal:
   1. If the second resale should bring more than the first resale, while the defaulting purchaser has no right to that "surplus" under *Simard v. White*, 383 Md. 257 [859 A.2d 168] (2004), the deficiency of the first defaulting purchaser should be reduced by the "surplus," inasmuch as a party (the lender or mortgagor) may not have double recovery for the same loss.
   2. If the first resale should bring in more than the original sale, and the Property then be resold for less than the original sale, the original purchaser should have no liability for any loss because the original purchaser did not occasion the loss.

5. McMullen is the only appellee to file a brief in this appeal. No briefs were filed by the Substitute Trustees, Zimmerman, or JBJ.

of the first defaulting purchaser until the sale is complete."
McMullen explains that a "foreclosure sale is not really a sale
at all because even following the sale, title does not pass until
the contract is performed, *i.e.*, the purchase price paid." In
other words, McMullen argues that "the property is not
treated as actually sold until the terms of sale have been met
or waived, and the purchaser has received or is entitled to
receive the conveyance of the property." Consequently,
McMullen argues that a resale "is within the continuation of
the original foreclosure," and the purchaser remains at risk,
notwithstanding that legal title has not been conveyed.

McMullen further contends that "[w]hether at an initial sale
or a resale, the primary purpose [of a foreclosure sale] is to
protect the interests of mortgagors and mortgagees." Ac-
cording to McMullen, although the "foreclosure sale cuts off
the mortgagor's equitable right of redemption, [ ] his legal
interest in his property does not cease until the foreclosure
sale is complete and a conveyance has occurred." McMullen
claims that "the mortgagor has the right to realize the full
value of his property," and when a resale is necessary, "the
mortgagor is the one placed in larger risk." Therefore,
McMullen concludes that "not only should the first defaulting
purchaser remain at risk for the difference between his bid
and the second defaulting purchaser's bid[,] he should remain
at risk for the difference between his bid and the ultimate sale
price."

## DISCUSSION

### I.

### INTERPRETATION OF MARYLAND RULE 14–305(g)

#### Standard for Interpretation of the Maryland Rules

The principles governing the interpretation of the Maryland
Rules are well established. When interpreting a Maryland
rule, "we must examine the 'words of the rule, giving them
their ordinary and natural meaning.'" *Zetty v. Piatt*, 365 Md.
141, 152, 776 A.2d 631 (2001) (quoting *State v. Harrell*, 348

Md. 69, 79–80, 702 A.2d 723 (1997)). "We are also to give effect to the entire rule, neither adding, nor deleting, words in order to give it a meaning not otherwise evident by the words actually used." *Brown & Williamson Tobacco Corp. v. Gress,* 378 Md. 667, 676, 838 A.2d 362 (2003).

■ In *Hoang v. Hewitt Ave. Assocs.,* 177 Md.App. 562, 588, 936 A.2d 915 (2007), this Court added:

> Where the language of the rule is clear and unambiguous, our analysis ends. However, the goal of such analysis is always to discern the legislative purpose. [ ] To that end we must consider the context in which [ ] the rule appears including related statutes or rules and relevant legislative history.

(Citations and quotations omitted). Therefore, "[e]ven if the language of a rule is clear, we may consider extrinsic material that fairly bears on the fundamental issue of the purpose or goal of the rule," including "the history of a particular rule as an aid to determining the court's intent." *State v. Wiegmann,* 350 Md. 585, 592–93, 714 A.2d 841 (1998) (citations and quotations omitted). In the end, "[o]ur mission is to give the rule a reasonable interpretation in tune with logic and common sense." *In re Victor B.,* 336 Md. 85, 94, 646 A.2d 1012 (1994).

### Analysis

We begin our analysis by examining the plain language of Maryland Rule 14–305(g).[6] *Morales v. Morales,* 111 Md.App. 628, 632, 683 A.2d 1124 (1996), *cert. denied,* 344 Md. 567, 688 A.2d 446 (1997). Rule 14–305(g) appears in Title 14, Sales of Property, Chapter 300, Judicial Sales. The rule addresses the procedure following a judicial sale, and section (g) specifically states:

> (g) **Resale.** If the purchaser defaults, the court, on application and after notice to the purchaser, may order a

---

6. Maryland Rule 14–305(g) was not changed by the major revision to the foreclosure rules adopted by the Court of Appeals effective on May 1, 2009.

resale at the risk and expense of the purchaser or may take any other appropriate action.

Rule 14–305(g) thus provides that the court, upon a purchaser's default, has the discretion to order a resale at the risk and expense of the purchaser or to take any other appropriate action.

As Simard accurately asserts, Rule 14–305(g) refers only to *a single resale* at the risk and expense of the defaulting purchaser. Although we recognize that Maryland Rule 1–201(d) provides that "[w]ords in the singular include the plural ... except as necessary implication requires," we conclude that Rule 14–305(g) necessarily implies that the term "a resale" must be singular and not plural. It is a practical impossibility to have more than one resale at a time. Moreover, the language of the rule precludes the court from ordering a series of resales upon the occasion of the initial default. Each time the court is faced with a defaulting purchaser in a foreclosure sale, the court must use its discretion in deciding whether a resale *or* some other action is most appropriate. *See McCann v. McGinnis*, 257 Md. 499, 511, 263 A.2d 536 (1970) (recognizing the existence of "situations in which it would not be just, wise or expedient to direct a resale at the risk of the original purchaser ..."). Where a court has been granted discretion by a rule, it must exercise that discretion. *See, e.g., Beverly v. State*, 349 Md. 106, 127, 707 A.2d 91 (1998) ("When a court must exercise discretion, failure to do so is error ..." (quotations omitted)). Consequently, the ordering of a series of resales upon the initial default would result in the court failing to exercise its discretion, as granted by the rule, to decide what the "appropriate action" should be after each successive default.

The Court of Appeals Standing Committee on Rules of Practice and Procedure ("the Rules Committee") assists the Court of Appeals in developing the Maryland Rules. As stated above, a review of a rule's history, which focuses on the Rules Committee's development of the rule, may be considered in determining the Court's intent behind a particular rule. *See Wiegmann*, 350 Md. at 593, 714 A.2d 841. The

history of Rule 14–305(g) was summarized by the Court of Appeals in *McCann:*

> [Maryland Rule 14–305(g) ] is a restatement of the preexisting statutory law found in Code (1957), Art. 16, § 163 prior to its repeal by Chapter 36, § 1 of the Laws of 1962. That section provided in part:
>
>> "The court shall have full power and authority, on application by * * * petition of the trustee appointed by said court to sell real estate, to compel the purchaser thereof to comply with * * * the terms of such sale, by process of attachment or other execution suited to the case; or the said court * * * may direct the property purchased to be re-sold, at the risk of such purchaser, upon such terms as the court may direct; and in such case, if the proceeds of the resale, after payment of the expenses thereof and of all costs of proceeding, shall not be equal to the payment of the purchase money originally bid therefor, the court may order and direct the difference to be paid by the said purchaser, and enforce such order by execution."
>
> Although the statute referred to sales by trustees appointed by the court, it has been held to apply to sales under the power contained in a mortgage.
>
> The statute remained unchanged from the time it was enacted as Code (1888), Art. 16, § 194, until its repeal. It was originally enacted as Chapter 216 of the Acts of 1841. The original enactment was altered when enacted as Code (1860), Art. 16, § 131 by the addition of the words "and enforce such order by execution". Otherwise, there was no change after the 1841 enactment until the 1962 repeal.

257 Md. at 506–507, 263 A.2d 536 (citations omitted). Therefore, there is nothing in the history of Rule 14–305(g) to indicate an intention that the original defaulting purchaser should be held liable for shortages arising from all subsequent resales.

We also have reviewed the entirety of the Rules Committee's minutes, proposed changes, and approved changes on

Rule 14–305(g) and have not unearthed any evidence that the Rules Committee intended for all subsequent resales to be held at the "risk and expense" of the original defaulting purchaser. If the Rules Committee had intended to create such a significant liability potential for a purchaser of foreclosed property, it would not have done so casually or inadvertently.

■ Therefore, we hold that Rule 14–305(g) does not provide that a defaulting purchaser be held liable for shortages arising from all subsequent resales. In other words, Rule 14–305(g) contemplates that, when a foreclosure purchaser defaults, the court may order a singular resale, not multiple resales, and the defaulting purchaser's "risk and expense" attaches only to the *one* resale resulting from his or her default.

### Application of Rule 14–305(g)

■ We find further support for our construction of Rule 14–305(g) in the application of the rule to the facts in the case *sub judice*. The record indicates that the parties *and* the court intended that the Second Resale be held at the risk and expense of only Zimmerman, and not at the risk and expense of Simard.

The Substitute Trustees' petition for the Second Resale listed "STAN ZIMMERMAN BY BORIS BRAUN" as the purchaser who defaulted by "refus[ing] to go to settlement" and asked the court to order a resale of the Property "at the sole risk and expense of the defaulting purchaser." In response to the Substitute Trustees' petition, the circuit court issued a Show Cause Order on March 27, 2008, in which the court ordered Zimmerman to show cause why the Property "should not be resold at the risk and expense of STAN ZIMMERMAN BY BORIS BRAUN" and why his deposit should not be forfeited, provided that copies of the petition and Show Cause Order were sent to Zimmerman and Betty. The court also scheduled a hearing for May 5, 2008. No

objection to the Substitute Trustees' petition or to the Show Cause Order was filed by any party.

Although no transcript of the May 5, 2008 hearing was included in the record before this Court, it appears from the record that counsel for the Substitute Trustees and Michelle, as Personal Representative of Betty's estate, were present at that hearing.[7] At the conclusion of the hearing, the trial court signed the Order Directing Resale of Mortgaged Property, prepared by one of the Substitute Trustees, in which the court ordered that the Property "shall be resold at the risk and expense of the defaulting purchaser, STAN ZIMMERMAN BY BORIS BRAUN."[8] Therefore, we conclude that, under the plain language of Rule 14–305(g), the Substitute Trustees' petition, and the trial court's order authorizing the Second Resale, Zimmerman, and not Simard, was liable for the shortage between the First Resale price of $163,000 and the Second Resale price of $130,000.

## II.

### COMPARISON WITH GENERAL CONTRACT LAW

The trial court held that Simard was responsible for the entire shortage occasioned by the First and Second Resales, because under *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145 (1854), the shortage from the Second Resale was

---

7. A handwritten note appears on the Order Directing Resale of Mortgaged Property, dated May 5, 2008, that states: "Plaintiff Trustees voluntarily consented in open court to discuss in good faith with [Michelle] the possibility of her purchasing the property at 403 Cherry Hill Rd. Reisterstown, MD 21136."

8. We express no opinion concerning whether the trial court was authorized to order the Second Resale held at the risk and expense of both Zimmerman and Simard. *See* Md. Rule 14–305(g) (stating that "the court . . . may take any other appropriate action"). Of course, notice to Simard and an opportunity to respond would have been required before any such liability could have been imposed on Simard. *See* Md. Rule 14–305(g). No notice or opportunity to respond was given to Simard in the instant case.

"clearly a foresseeable damage." Simard claims that in so holding, the trial court erred. We agree.

This Court has determined:

The purchase and sale transaction at any judicial sale is governed by general principles of contract, with the court acting as vendor:

In all sales made under the authority of a decree of a court of equity, the court is the vendor, acting for and in behalf of all parties interested. The contract of sale is a transaction between the court as vendor, and the purchaser; and the contract is never regarded as consummated until it has received the sanction of the court[.] Before ratification the transaction is merely an offer to purchase which has not been accepted.

*       *       *

In the context of a foreclosure sale, the contract of sale is not final until the court ratifies the sale. Such a sale does not pass the title unless it is ratified and confirmed. The court is the vendor acting through its agent the trustee.... He reports to the court the offer of the bidder for the property; if the offer is accepted, the sale is ratified, and thereupon, and not sooner, the contract of sale becomes complete.

*White v. Simard,* 152 Md.App. 229, 241–42, 831 A.2d 517 (2003) (quotations omitted), *aff'd,* 383 Md. 257, 859 A.2d 168 (2004). Because the contract of sale is between the court and the purchaser, when the purchaser fails to comply with the terms of the sale, he has breached his contract with the court. Then, "the question with which we are faced when, as here, there is the failure on the part of a purchaser to comply with the terms of sale by settlement, is what remedy exists for breach of contract with the court." *McCann,* 257 Md. at 505–506, 263 A.2d 536. If the court determines that a resale is the proper remedy for the breach of contract, then a new offer is presented to the court, which must be accepted and ratified by the court. Upon acceptance and ratification of the new offer, then a new contract is formed with the resale purchaser.

Accordingly, we will examine Simard's liability for breach of contract under general contract principles.

**General Damages from a Breach of Real Estate Contract**

In Maryland, "the measure of damages when a vendee breaches a contract to purchase real estate is the difference between the contract price and the fair market value at the time of breach." *Kasten Constr. Co., Inc. v. Jolles*, 262 Md. 527, 531, 278 A.2d 48 (1971). A property's resale price may substitute for the fair market value in establishing damages if the resale occurs within a reasonable time after the breach. *See id.* at 531–32, 278 A.2d 48. *See also* 14–81 *Powell on Real Property* § 81.04 (2010) ("One of the strongest indications of the value of the property is the price obtained on a resale by the seller following the purchaser's breach."); 11–60 *Corbin on Contracts* § 60.12 (2005) ("In a falling market, courts have held that it is appropriate to measure damages based on market value at the time of resale.") Although *Kasten* does not define what is "reasonable time," other courts have found relevant whether "the property [wa]s actively marketed from the time of the purchaser's breach and could not be sold at a higher price" in determining "reasonable time." 77 Am.Jur.2d *Vendor & Purchaser* § 482 (2010). *See also Contract Freighters, Inc. v. J.B. Hunt Transp., Inc.*, 245 F.3d 660, 664 (8th Cir.2001) (concluding that the sales price of a facility eight months after the breach of contract was fair market value of the property where it was the highest offer received); *Rokowsky v. Gordon*, 531 F.Supp. 435, 439 (D.Mass.1982), *aff'd*, 705 F.2d 439 (1st Cir.1983), *cert. denied*, 462 U.S. 1120, 103 S.Ct. 3089, 77 L.Ed.2d 1350 (1983). In addition, the resale price cannot be used as a measure of damages where the sale does not "resemble [an] arms length transaction[ ]." *Kasten*, 262 Md. at 532, 278 A.2d 48.

In the case *sub judice*, Simard's contract for the purchase of the Property at the price of $192,000 became final by virtue of the court's ratification of the sale in the order dated April 16, 2007. Simard, however, failed to go to settle-

ment,[9] and on May 25, 2007, the Substitute Trustees filed a petition requesting the court to order a resale of the Property. On August 1, 2007, the court ordered a resale of the Property at Simard's risk and expense. Less than six months after Simard's breach of contract, on October 16, 2007, Zimmerman purchased the Property at the First Resale.

We conclude that the First Resale price of $163,000 may be used as the fair market value in calculating the damages for Simard's breach. The First Resale represents an "arm's length transaction." Each party, unrelated to one another, acted "at arm's length" to further their own interests at the First Resale. *See Brass Metal Prods., Inc. v. E–J Enters., Inc.,* 189 Md.App. 310, 349, 984 A.2d 361 (2009). *See also* Black's Law Dictionary 109 (6th ed. 1990) (defining "arm's length transaction" as "a transaction negotiated by unrelated parties, each acting in his or her own self interest; the basis for a fair market value determination."). This arm's length transaction occurred less than six months after the breach, and the price of $163,000 was the highest price received for the property at the First Resale. Accordingly,[10] under general contract principles, Simard is liable for the difference between the Original Sale price of $192,000 and the First Resale price of $163,000, or $29,000.

### Consequential Damages from a Breach of a Real Estate Contract

In addition to the general damages laid out above, the non-breaching party may be entitled to "consequential damages." *See Hoang,* 177 Md.App. at 594–95, 936 A.2d 915. Consequential damages cover those losses suffered by the

---

**9.** Under the advertised terms of sale, Simard was required to go to settlement within ten days after the final ratification by the circuit court, *i.e.,* by April 26, 2007.

**10.** The Second Resale price of $130,000 from the June 12, 2008 sale, however, cannot be used as the fair market value in calculating damages. The Second Resale occurred over a year after Simard's April 2007 breach of contract and is therefore too remote to be considered as the fair market value at the time of the breach.

non-breaching party other than the loss in value of the other party's performance. Restatement (Second) of Contracts § 347 cmt. c (1981). Such damages must be "reasonably foreseeable" and must "fairly and reasonably be supposed to *have been in the contemplation of both parties* at the time they made the contract, as the probable result of the breach of it." *Hoang,* 177 Md.App. at 594–95, 936 A.2d 915 (quoting *Winslow Elevator & Mach. Co. v. Hoffman,* 107 Md. 621, 635, 69 A. 394 (1908)). Not all damages that are "reasonably foreseeable," however, may be recovered as consequential damages; like general damages, consequential damages must be *"caused by the breach"* of contract. Restatement (Second) of Contracts § 347(b) (1981) (emphasis added). In other words, the losses claimed by the non-breaching party must have "actually resulted from the breach." *See, e.g., Hoang,* 177 Md.App. at 594, 936 A.2d 915; *MLT Enters. v. Miller,* 115 Md.App. 661, 674, 694 A.2d 497 (1997) ("Under both tort and contract law, one claiming damages must prove that tortious act or breach of contract was the proximate cause of the damages claimed.").

■ In the case *sub judice,* the trial court characterized the damages at issue as "consequential damages of the breach of contract." The court focused its analysis on "foreseeability," *i.e.,* and whether it was "highly foreseeable when somebody breaches the contract, and there's another sale that . . . that person might breach the contract as well?" McMullen and Simard agreed that such breach was foreseeable, but Simard argued that he did not believe "that control[led] the result." The trial court disagreed with Simard, and ruled:

> I believe my ruling has to be against [ ] Simard because of the concept of foreseeability and consequential damages when it seems to me that the reason why the second sale price, or the third and ultimate sale price is so much lower is because of market forces that intervene.
>
> We went from a very robust real estate market to a very weak real estate market, and . . . that's foreseeable.

If in fact you default, sure, there's a chance that if the market goes up, you will have absolutely no damages because there will be a greater sales price. But likewise, there's also a chance that the market will go down and the sale price will become lower.

... **[I]t seems to me that [Simard] is responsible for his damages in that the reduced sale price of the second sale that was defaulted upon is clearly a foreseeable damage, so respectfully the Court denies [Simard's] exceptions on that basis.**

(Emphasis added).

Although the trial court may be correct that the default on the First Resale and the subsequent lower purchase price at the Second Resale were foreseeable, we disagree with the focus of its analysis solely on the foreseeability of the damages arising from the default on the First Resale. As stated above, foreseeability is but one of the requirements that must be shown by the non-breaching party to be awarded consequential damages. *See Hoang,* 177 Md.App. at 594, 936 A.2d 915. What the trial court did not address was whether Simard's breach of contract *caused* the damages arising from Zimmerman's default in the First Resale.

At oral argument before this Court, McMullen argued that whether or not Simard caused the default in the First Resale did not matter. Specifically, McMullen asserted that the default in the First Resale and the damages flowing therefrom were foreseeable because they represented a continuation of the original foreclosure proceeding, and because Simard voluntarily entered into the original foreclosure proceeding, he should be held liable for any subsequent defaults regardless of causation.[11] We disagree.

---

11. McMullen further argued that Simard should not be entitled to any protection from the court for his failure to fulfill his obligations. According to McMullen, the trial court monitors the foreclosure proceedings for the benefit of the mortgagor and the mortgagee, and not for the protection of the defaulting purchaser. Therefore, because a defaulting purchaser is a "wrongdoer," McMullen concluded that the

Whether Simard may be held liable for damages arising from Zimmerman's default in the First Resale depends on whether Simard *caused* such default, which led to the Second Resale of the Property and the additional damages from the lower purchase price at the Second Resale. We hold that Simard's breach of contract did not *cause* the default in the First Resale. We shall explain.

As Simard concedes, he is "responsible" for the shortage between the Original Sale price of $192,000 and the First Resale price of $163,000 ("First Shortage"). The auditor properly allocated the First Shortage to be paid by Simard because Simard's breach proximately caused this loss. *See id.* Phrased differently, the First Shortage was *actually caused by* Simard's breach of contract. In contrast, the shortage between the First Resale price of $163,000 and the Second Resale price of $130,000 ("Second Shortage") did not *actually result* from Simard's breach of contract. The Second Shortage was caused by *Zimmerman's* breach of contract.

In this regard, like Simard, we find the Court of Appeals' opinion in *Baltrotsky v. Kugler*, 395 Md. 468, 910 A.2d 1089 (2006), instructive. In *Baltrotsky*, after a foreclosure sale, the mortgagor "filed myriad motions and *lis pendens* actions, mostly arguing that Petitioner's collateral pending bankruptcy filing should [void the sale] and stay the foreclosure proceedings," which resulted in an eleven month delay in the settlement on the sale. *Id.* at 471–72, 910 A.2d 1089. According to the advertised terms of the foreclosure sale, the foreclosure purchasers were obligated to pay interest on the unpaid purchase price from the date of the foreclosure sale to the date of settlement. *Id.* at 476, 910 A.2d 1089. Consequently, the foreclosure purchasers moved for an abatement of the interest, "citing as justification Petitioner's filings and the resultant delays." *Id.* at 473, 910 A.2d 1089. The *Baltrotsky* Court affirmed this Court's upholding of the trial court's

court should hold the defaulting purchaser liable for all losses from any subsequent resales. As explained *infra,* the principles of Maryland contract law do not support such result.

decision to abate the accrued interest. *Id.* at 474, 910 A.2d 1089. Of principal importance, the Court found that the mortgagor's "tenacious exploits to void the foreclosure sale and delay settlement" actually caused the delay of settlement and "constituted 'conduct of other persons beyond the power of the purchaser to control or ameliorate.'" *Id.* at 479–81, 910 A.2d 1089. Because the foreclosure purchasers had no control over the mortgagor's actions that resulted in the delay of the settlement, the Court concluded that the trial court appropriately abated the interest from the date of the foreclosure sale to the date of settlement. *Id.* at 481, 910 A.2d 1089.

▮ Similar to *Baltrotsky,* a defaulting purchaser does not typically have any control over a subsequent purchaser's actions. The actions of a subsequent purchaser are "beyond the power of the purchaser to control or ameliorate." *See id.* Thus a first defaulting purchaser does not cause shortage damages arising from a subsequent purchaser's default. Accordingly, under general contract principles, the consequential damages arising out of a default by a foreclosure sale purchaser do not include damages arising out of a default of a subsequent sale of the subject property.

In the case *sub judice,* Simard had no control over Zimmerman's actions, namely, Zimmerman's default in the First Resale, which resulted in a Second Resale of the Property and a lower purchase price. Zimmerman's default "constituted 'conduct of other persons beyond the power of [Simard] to control or ameliorate.'" *Id.* Therefore, because Simard's breach of contract did not *cause* Zimmerman to default on the First Resale, Simard is not be liable for the Second Shortage. Accordingly, the trial court erred by holding that Simard was responsible for the Second Shortage as consequential damages for his breach of the Original Sale.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. APPELLEES TO PAY COSTS.**